**Richard HUMMEL, Plaintiff,**

v.

**CITY OF CARLISLE, et al., Defendants.**

**No. C–3–00–539.**

United States District Court,
S.D. Ohio,
Western Division.

Sept. 23, 2002.

Jeffrey Michael Silverstein, Jeffrey M. Silverstein & Associates, Dayton, OH, for Plaintiff.

Daniel Paul Whitehead, Isaac, Brant, Ledman & Teetor, Columbus, OH, John T. McLandrich, Mazanec, Raskin & Ryder Co., LPA, Cleveland, OH, Dianna M. Anelli, Mazanec, Raskin & Ryder, Co., LPA, Columbus, OH, Lynne K. Schoenling, Curry, Roby & Schoenling, Co., LLC, Columbus, OH, David A. Goldstein, Westerville, OH, for Defendants.

DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. #13); PLAINTIFF IS DIRECTED TO FILE AN AMENDED COMPLAINT, WITHIN 30 DAYS FROM DATE, CLEARLY STATING "USE OF EXCESSIVE FORCE" AS A BASIS FOR HIS FIRST CLAIM FOR RELIEF

RICE, Chief Judge.

Plaintiff Richard Hummel filed the underlying suit against Defendants City of Carlisle ("the City" or "Carlisle") and Carlisle Police Officers Chad Allen, Douglas Lanier, and David Ward (collectively, "the officers"). Plaintiff raises several causes of action. Primarily, he asserts a cause of action under 42 U.S.C. § 1983, alleging that the officers violated his Fourth and Fourteenth Amendment rights. Additionally, he asserts state law causes of action for assault, battery, false arrest, trespass, and malicious prosecution. Plaintiff filed his Complaint (attached to Doc. # 1) in the Montgomery County, Ohio, Common Pleas Court, and Defendants removed the action to this Court pursuant to 28 U.S.C. § 1441, based upon the Court's original jurisdiction over the federal cause of action.

I. *Factual Background*[1]

The events giving rise to Plaintiff's claim against Defendants transpired over the

---

**1.** For purposes of ruling on Defendants' Motion for Summary Judgment, the Court will construe the facts, and all reasonable infer-

course of several hours on October 4, 1999. (Hummel Depo. at 8.) To begin, at about 5:30 p.m., Plaintiff was driving in a southeasterly direction on State Route 123 ("SR 123"), approaching the Village of Carlisle, Ohio,[2] en route to Franklin, Ohio. (*Id.* at 8, 10.)[3] At the vicinity in question, SR 123 is a two-lane highway, with a single lane for travel running in either direction. (*Id.* at 18.) Carlisle, and the stretch of SR 123 in question, is situated in Warren County. (*Id.* at 8.)

Plaintiff had just departed from his own residence on SR 123, which lies north of the county line, in German Township, Montgomery County, Ohio (*id.* at 6, 49), and was about a half mile to the southeast when he came up behind a traffic backup of about ten cars. (*Id.* at 8.) Plaintiff observed that the backup was due to a police cruiser idling in his lane. (*Id.* at 8, 19.) A Carlisle officer was apparently conducting a traffic stop (*id.* at 11), but because there was no berm to the road (*id.* at 18) he was not able to pull off to the side. As a result, and as a matter of caution, the cars in the southeasterly flowing lane were obliged to pause and wait for the opposite flowing traffic to clear before crossing the double yellow center dividing line and proceeding around the stopped police vehicle. (*Id.* at 11, 19.) To make the matter worse, traffic was heavy at the time. (*Id.* at 11; Allen Depo. at 11.)

According to Plaintiff, at the location under discussion, SR 123 rises on an incline relative to southeasterly travel and one's visibility of objects beyond the crest of the hill out in front is obstructed. (Hummel Depo. at 12.) In light of these circumstances, Plaintiff was concerned

that the position of the police cruiser posed a hazard to other drivers. (*Id.* at 11.) Accordingly, he pulled up directly behind the stopped cruiser, exited his vehicle, and approached its driver's side to address the police officer within the cruiser in regard to the perceived danger. (*Id.* at 13.) Officer Allen was later identified as the officer at the wheel of the stopped cruiser. (*Id.* at 20.) Plaintiff opined to Officer Allen that a better place to have stopped the traffic violator would have been about 300 feet farther ahead, where SR 123 apparently widens and allows for other cars to pass more easily. (*Id.* at 13.)

While speaking to Officer Allen, Plaintiff was standing in the oncoming lane of traffic. (*Id.* at 19.) Officer Allen informed Plaintiff that he was interfering with police duties and would be arrested if he did not depart the scene by the count of three. (*Id.* at 15.) When Officer Allen began his count, Plaintiff complied, returned to his car, and departed the scene as traffic permitted. (*Id.* at 15–18.) The two never raised their voices. (*Id.* at 16.) Plaintiff later learned that Officer Allen stopped by his residence about 45 minutes after their encounter. (*Id.* at 42.) The purpose of Officer Allen's visit to Plaintiff's residence was to issue Plaintiff citations for blocking traffic and disorderly conduct. (Allen Depo. at 19.)

The facts recounted thus far provide the necessary prelude to the events ultimately giving rise to Plaintiff's § 1983 cause of action. To continue, after leaving the scene of the traffic backup, Plaintiff proceeded to run errands over the course of the next several hours. (Hummel Depo. at

---

ences drawn therefrom, in a light most favorable to Plaintiff, who is the non-moving party. For the most part, the facts stated herein are taken from Plaintiff's Deposition.

**2.** Apparently, Carlisle was at the time designated a "village," but is now a "city." (*See*

Hummel Depo. at 14.) The change is immaterial to this action.

**3.** The Court takes judicial notice that SR 123, in the vicinity under discussion, runs generally northwest and southeast.

21-25.) When he arrived home, a Carlisle police cruiser was in his driveway. (*Id.* at 26.) Plaintiff observed a single officer in the cruiser (*id.* at 27-28) and his sister on the back porch, which is visible from where Plaintiff parked in his driveway. (*Id.* at 28.) After Plaintiff exited his car and approached the cruiser, he recognized Officer Allen from their earlier encounter. (*Id.* at 28-29.) Officer Allen asked Plaintiff for his driver's license. (*Id.* at 29.) When Plaintiff asked, "why?," Officer Allen simply asked for it again, without providing an explanation for his request. (*Id.* at 29-30.) Predictably, the two men began conversing in circles: Officer Allen steadfastly requesting Plaintiff's license; Plaintiff recriminating that Officer Allen was out of his jurisdiction[4] and trespassing on Plaintiff's property. (*Id.* at 30.) Indeed, Plaintiff told Officer Allen to "hit the road" and "go back from where [you] came." (*Id.* at 33.)

Not long after the breakdown in communication, two more Carlisle police cruisers pulled into Plaintiff's driveway, occupied by Officers Ward and Lanier. (*Id.* at 34.) Plaintiff commented aloud that the presence of three Carlisle officers in his yard was "like the county fair," and he went into his home with the intent to procure his camera. (*Id.* at 36.) Plaintiff came back out a few minutes later with his camera, but without his driver's license. (*Id.* at 37.) He proceeded to take a photograph of the three officers and his sister, the latter having moved into the back-ground. (*Id.* at 38-39.) Plaintiff acknowledges that at least two of the officers were smiling (*id.* at 37) and that none expressed any sign of animosity at the time he snapped the photograph. (*Id.* at 39-40.) He also acknowledges that his sister was "relaxed" during this period. (*Id.* at 39.)

Thereafter, Officer Allen again asked Plaintiff for his license, and Plaintiff replied that he did not have it on his person. (*Id.* at 53.) Officer Lanier then made the same request (*id.*) and again Plaintiff responded by telling the officers to "hit the road" because they were on his property and out of their jurisdiction. (*Id.* at 54.) Officer Lanier then announced that he was the ranking officer of the three, and raised the matter of the earlier encounter between Plaintiff and Officer Allen. (*Id.*) This prompted further debate between Plaintiff and Officer Lanier as to the specifics of what had occurred earlier in the day, Plaintiff taking umbrage at Officer Lanier's suggestion that he (Plaintiff) had "screamed" at Officer Allen. (*Id.*) During the same encounter, Plaintiff made a point of mentioning to the officers that he believed the Carlisle Police Department had a bad reputation in its community. (*Id.* at 55-56.)

Up to this point, the officers had still not told Plaintiff why they wanted to see his license or that they intended to issue citation(s). (*Id.* at 43.)[5] As far as Plaintiff was concerned at the time, he had no obligation to "surrender" his license to a police officer who was on his private prop-

---

**4.** Presumably, the comment on jurisdiction relates to the fact that Plaintiff's property is within German Township, in Montgomery County, outside the municipal limits of Carlisle.

**5.** Arguably, Plaintiff's deposition testimony on this point is inconsistent. While he insists the officers "never" told him of the purpose of their visit (Hummel Depo. at 43), he acknowledges that Officer Lanier related their visit to his earlier encounter with Officer Allen. (*Id.* at 54.) He also states that he "knew why [Officer Allen] was there" (*id.* at 55), opining that he "had a crow to pick." Nonetheless, for reasons which will become clear in the Court's analysis, even if Plaintiff knew or could have surmised the reason Defendant officers were at his residence, it would not change the outcome of the Court's rulings, because his rights which were allegedly violated did not hinge on his knowledge of such.

erty in a non-emergency situation, and who would not tell him the purpose for why he was requesting his license. (*Id.* at 50–51.) Eventually, Plaintiff sensed the "mood" deteriorating, though he insists that he was not contributing to that deterioration. (*Id.* at 57.) Sensing that the three officers were "closing in" on him, Plaintiff mentioned to them that he did not want a "Rodney King" incident. (*Id.* at 43, 57–58.) At some point, but no more than ten minutes from the time he had taken the photograph (*id.* at 59), he turned to go back into his house and they "grabbed" him and "threw" him against the side of his car. (*Id.* at 58.) (At no time had he been told that he was not allowed to go into his home. (*Id.* at 60.).) His groin hit the side-view mirror, particularly painful to Plaintiff on account of his having undergone surgery for a hernia two weeks before. (*Id.* at 68.) The officers then "shoved" or "threw" him onto the hood. (*Id.* at 60.) Plaintiff screamed at them, stating that they were "out of control." (*Id.*)

Soon after, Plaintiff's sister intervened, and the officers backed off. (*Id.* at 59, 62, 68.) Concerned for his safety, Plaintiff stated that he was going to call the German Township police, at which point Officer Lanier grabbed his jacket. (*Id.* at 62.) Plaintiff broke away from the officer's grip and ran into his home, locking the door behind him. (*Id.* at 62.) Inside, while Officer Lanier pounded on the door, threatening to break it in (*id.*), Plaintiff began calling a number of people for advice on how to handle the situation. First, he called the German Township Police Department with the intention of speaking to its chief and of having a Township officer dispatched to his home. (*Id.* at 46.) He then called a nephew of his, George Combs, who is apparently a police officer in Beavercreek, Ohio. (*Id.* at 44, 46.) Finally, he called Warren County Common Pleas Judge Daniel Fedders, a longtime acquaintance of his. (*Id.* at 46.) Judge Fedders told Plaintiff that he would call the Mayor of Carlisle, Pat Long, and then call Plaintiff back. (*Id.* at 49.)

After Plaintiff got off the phone with Judge Fedders, he let German Township Officer Joe Andzik, who had since arrived on the scene, into his home. (*Id.* at 50.) While speaking with Officer Andzik, Judge Fedders called Plaintiff and informed him that he should have the Carlisle officers phone the Carlisle Law Director, a gentleman by the name of Chicarelli, to help resolve the standoff. (*Id.* at 72.) Officer Andzik conveyed this information to the Carlisle officers. (*Id.* at 73.) Eventually, feeling more confident in the presence of Officer Andzik, Plaintiff ventured back outside, and shortly thereafter Officer Lanier shouted to him from a distance that Mr. Chicarelli would like to speak to him (on the officer's car phone). (*Id.*) Plaintiff complied and was informed by Mr. Chicarelli that the Carlisle officers were interested in citing him and that he should accept the citations and let him (Mr. Chicarelli) worry about the propriety of it all on the following business day. (*Id.* at 74.)

Three citations were issued to Plaintiff, one for resisting arrest, a second for a traffic violation, and a third for disorderly conduct. (*Id.* at 90.) The resisting arrest and disorderly conduct charges were subsequently dropped. (*Id.* at 90–91.) In return for a plea of no contest to the traffic violation, Plaintiff was assessed court costs of $50 and the fine was waived. (*Id.* at 91.)

Plaintiff argues that the officers did not have probable cause to arrest him or to issue the citations. (Compl. ¶ 20; Memo. Contra (Doc. # 16) at 3.) It is the issuance of these citations which presumably gives rise to the § 1983 cause of action (First Claim for Relief) and the state law claims of malicious prosecution (Third Claim for

Relief) and false arrest (Fourth Claim for Relief). It is their entry onto his property and their physical treatment of him which presumably give rise to the state law claims of assault and battery (Second Claim for Relief) and trespass (Fifth Claim for Relief).

Not surprisingly, Defendants present a very different version of the facts with respect to the relative temperaments of the various actors. Defendant officers argue that probable cause existed to issue the citations and that, with respect to the physical confrontation, they used only limited, reasonable force. For that reason, they argue the § 1983 action is without merit. Alternatively, they argue that are entitled to qualified immunity for their actions. As well, they argue that they are statutorily immune from liability for the state causes of action. The City argues that it cannot be held liable because Plaintiff has failed to prove its direct involvement in any violation of his federal or constitutional rights.

## II. *Standards Governing Motions for Summary Judgment*

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an ·element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991)(The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.")(quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law, Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994)("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such

that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), cert. denied, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Sys., Inc.*, 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.

7 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992)("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment...."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

## III. *Analysis of § 1983 claim*

██ 42 U.S.C. § 1983 provides a civil cause of action to any citizen of the United States against any person who, under color of state law, deprives the citizen of "any rights, privileges, or immunities secured by the Constitution and laws of the United States." *See Christy v. Randlett*, 932 F.2d 502, 504 (6th Cir.1991) (citations omitted). In order to succeed on a § 1983 claim, a plaintiff must prove two elements: (1) that he was deprived of a right secured by the Federal Constitution or laws of the United States; and (2) that he was subjected to this deprivation by a person acting under the color of state law. *See Searcy v. City of Dayton* 38 F.3d 282, 286 (6th Cir.1994). "By its terms, § 1983 creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *Gardenhire v. Schubert*, 205 F.3d 303, 310 (6th Cir.2000) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

The Court will first address whether the facts support a finding that Plaintiff's constitutional rights were violated by the officers. The Court will then address, as necessary, the impact of the "qualified immunity" doctrine. Finally, the Court will

discuss whether any wrongdoing can be imputed to the City.

### A. Liability of Defendant Officers

There is no question that the officers were acting either in, or under color of,[6] their official capacities as police officers for the City of Carlisle. The only question is whether Plaintiff was deprived of a right secured by the Federal Constitution or laws of the United States. As its first task, then, the Court must identify the basis or bases presented by Plaintiff for his § 1983 cause of action. In his First Claim for Relief, he alleges that the officers violated his Fourth and Fourteenth Amendment rights. He states only one *clear* ground which would give rise to a finding of a constitutional violation (if, as the Court assumes for purposes of ruling on summary judgment, his alleged facts are true): that the officers were without probable cause to issue him citations. (Compl. ¶ 20.) Arguably, he provides an "unwarranted seizure" or "excessive force" basis for a § 1983 cause of action with his allegations that he was subjected to severe physical injury (*id.* ¶ 17) and deprived of his personal freedom (*id.* ¶ 22). Defendants interpret the issue presented by the Complaint as one turning on probable cause, and do not address, in their primary brief, an independent ground of excessive force. For his part, Plaintiff addresses the probable cause issue, but also vaguely alludes to an excessive force claim, stating rather generically that "[his] rights under the Fourth Amendment to be free from unreasonable seizures and excessive force are clearly established." (Doc. # 16 at 4

(citing *Graham v. Connor,* 490 U.S. 386, 392–93, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *California v. Hodari,* 499 U.S. 621, 624–25, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *Pray v. City of Sandusky,* 49 F.3d 1154 (6th Cir.1995)).) In their Reply brief (Doc. # 18), while they dispute the merits of the latter claim, Defendants do not contest it for being outside the pleadings. (*See* Doc. # 18 at 5–6.)

Because the Court finds, pursuant to Ohio's liberal "Rule Pleading" system, *see* Ohio R. Civ. P. 8(A) & related Staff Note, that it is possible to read the Complaint as stating an excessive force (or unreasonable seizure) basis for Plaintiff's § 1983 cause of action, it will address this basis for the § 1983 claim along with the issue of whether the Defendants acted with probable cause. However, so as to avoid any confusion henceforth, the Court shall also direct Plaintiff to file, within 30 days from date, an amended complaint, clearly stating this basis for his § 1983 claim.

Turning to the substantive arguments, the Court will address the probable cause issue first. " '[P]robable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979) (citations omitted). Furthermore, "[w]hether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law."

6. There is some question as to whether Officer Ward was actually "on the clock" at the time. (*Compare* Hummel Depo. at 69 *with* Ward Depo. at 27–28.) On the other hand, it is not disputed that he was in uniform when he appeared at Plaintiff's residence. Furthermore, there is no indication that his participation, however great or limited it might have been, was not undertaken in his capacity as a police officer. Thus, even if he was technically "off the clock," he was still "clothed with the authority of," and acting under the "pretense" of, state law. *See Waters v. City of Morristown, Tenn.,* 242 F.3d 353, 359 (6th Cir.2001).

*Id.* at 36, 99 S.Ct. 2627. That is, without an understanding of the elements of the state (or municipal) crime, it would be impossible to make a determination of the reasonableness of the arrest (or the issuance of a citation in lieu of arrest).[7]

Plaintiff was cited under Carlisle ordinance 452.01 for obstructing traffic on SR 123. (Allen Depo. at Ex. 1.) He was cited under Carlisle ordinance 648.04 for disorderly conduct. (*Id.* at Ex. 2.) He was cited under Carlisle ordinance 606.16 for resisting arrest. (*Id.* at Ex. 3.) The first two offenses stemmed from his encounter with Officer Allen earlier in the day; the third offense stemmed from his behavior that evening back on his property. (*Id.* at 32.) The Court has not been provided with the text of these specific ordinances; nor does it have copies of such at its disposal. However, the Ohio Revised Code sets forth the same provisions,[8] and the Court may turn to it for insight.

■ Section 4511.66 of the Revised Code prohibits the stopping of a vehicle on the "main traveled" portion of a highway (except in situations not relevant hereto). Construing the facts most strongly in Plaintiff's favor, it is apparent that reasonable people could not disagree that he violated this ordinance, which constitutes a minor misdemeanor. *See* Ohio Rev.Code § 4511.99(D)(1)(a). Furthermore, under § 2917.11(A)(4), it is disorderly conduct to "[hinder or prevent] the movement of persons on a public street, road, highway, or right-of-way, ... so as to interfere with

the rights of others, and by any act which serves no lawful purpose and reasonable purpose of the offender." Again, viewing only the facts as recounted by Plaintiff in his deposition, there can be no doubt in a reasonable person's mind that his actions gave rise, *at the very least,* to probable cause to believe he was being disorderly. The fact that a peace officer was also stopped in the middle of the highway does not neutralize the consequences of Plaintiff's own act, or of his standing in the oncoming lane of traffic during rush hour to give Officer Allen a piece of his mind. Under the circumstances, this violation would also constitute a minor misdemeanor. *See id.* § 2917.11(E). Clearly, Officer Allen had probable cause to believe these ordinances had been violated, and therefore was justified in citing Plaintiff for as much. Thus, a § 1983 cause of action cannot be supported on these grounds.

■ With respect to the resisting arrest charge, on the other hand, it is clear from the record that no arrest was ever initiated or intended, let alone effected. (Allen Depo. at 39; Ward Depo. at 49; Lanier Depo. at 33.) Officer Allen states in his Deposition, however, that Plaintiff's failure to cooperate with their requests for his driver's license amounts to the same thing as resisting arrest. (Allen Depo. at 39.) The Ohio General Assembly has defined resisting arrest as the reckless or forceful resistance of, or interference with, "a lawful arrest." *See* Ohio Rev.Code § 2921.33. Defendants have not cited a single authori-

---

7. As an abstract principle, it may be that the Fourth Amendment is less concerned with the issuance of citations than it is with actual arrests. Certainly, the former impinges upon one's privacy and person to a lesser degree than the latter. Equally true, however, is that a citation issued in lieu of arrest must have support for its issuance, and the Court can think of no standard other than the very same probable cause which would provide the basis for actual arrest. The parties do not address

this issue, and the Court need not dwell on it; it is raised in this footnote merely in light of the fact that the "probable cause" case law is overwhelmingly preoccupied with arrests, not the issuance of citations.

8. To the extent municipal traffic regulations are of a criminal nature, they must be uniform with the provisions set forth in the Ohio Revised Code. *See* Ohio Rev.Code § 4511.06.

ty for the proposition that in Ohio, or Carlisle, one may resist an arrest where no arrest exists. By the language of the Ohio Revised Code, such a proposition is untenable. As a matter of law, Plaintiff did not resist arrest within the meaning of § 2921.33. As a matter of fact, reasonable jurors could find, indeed would be compelled to find, that Officer Allen issued the citation without probable cause and therefore in violation of Plaintiff's constitutional rights.

When the facts are viewed in a light most favorable to Plaintiff, the Court finds that no genuine issues of material fact exist with respect to Officer Allen's issuance of citations to Plaintiff for the traffic violation and disorderly conduct. To the extent Plaintiff's § 1983 cause of action relates to the issuance of these citations, Defendants' Motion is SUSTAINED. However, it is plain that Defendants did not have probable cause to suspect Plaintiff of resisting arrest, and the summary judgment determination thus hinges on the qualified immunity determination, discussed at a later point in this Entry.

 The Court will now take up the matter of use of excessive force. Such a claim invokes the protections of the Fourth Amendment, which guarantees citizens the right to be secure in their persons, and the officers' conduct must be analyzed under that Amendment's "reasonableness" standard. *See Graham v. Connor*, 490 U.S. 386, 394–95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (internal quotation omitted). "[S]ome degree of physical coercion or threat thereof" is constitutionally acceptable when police officers are effecting a stop or full arrest. *Id.* at 396, 109 S.Ct. 1865. Importantly, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers[,] violates the Fourth Amendment." *Id.* (internal quotation and citation omitted). "The calculus of reasonableness must em-body allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. 1865.

The officers' respective versions of the facts and events of October 4, 1999, both at the scene of the traffic stop on SR 123 and later at Plaintiff's home, are significantly different than Plaintiff's. Not surprisingly, the two sides in this dispute tend to emphasize the other's aggressiveness and their own pacifism. Of course, for purposes of ruling on summary judgment, all disputed questions of fact must be viewed in favor of the non-moving party, who in this case is the Plaintiff.

In light of the facts set forth above, extracted primarily from Plaintiff's Deposition testimony, the Court finds that the reasonableness of all three officers with respect to the way they physically treated Plaintiff on his property presents a textbook case of a genuine issue of material fact. That is, under the given circumstances, construing the facts and all reasonable inferences in a light most favorable to Plaintiff, it is impossible to state, as a matter of law, that the treatment of Plaintiff by the officers was reasonable. Therefore, as with the issue concerning the citation issued for resisting arrest, whether summary judgment is appropriate with respect to the excessive force basis for Plaintiff's § 1983 claim turns on whether Defendants are entitled to qualified immunity, the issue to which the Court will now turn.

### B. *Qualified Immunity*

 Having found that the officers could not have had probable cause to believe that Plaintiff was resisting arrest, and having found genuine issues of materi-

al fact existing with respect to the issue of excessive force, the Court must now determine whether the officers are nevertheless entitled to avoid trial on the basis of immunity. In the interest of protecting public officers in the course of performing their discretionary duties from unduly onerous lawsuits under § 1983, the Supreme Court has recognized "qualified immunity" for such officers, "shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Thus, in order for public officer to be held accountable, the right she is charged with violating must be clearly established, and be one of which a reasonable officer in her position would have known. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Furthermore, the "clearly established law" that forms the focal point of the Court's inquiry must be defined with particularity, and not in the abstract. *See Anderson, supra,* at 639–40, 107 S.Ct. 3034. For instance, it is not enough to say that because the *general* right to due process as guaranteed by the Due Process Clause is clearly established, any *specific action* later found to be violative of the Due Process Clause is *per se* violative of a "clearly established" right. *See id.* at 639, 107 S.Ct. 3034. Rather, a court must more closely scrutinize "the contours" of the right allegedly violated; it must attempt to analyze the right allegedly violated in a particularized, less generalized, context, i.e., in light of the specific facts of the lawsuit under scrutiny. Thus, the relevant question is whether an officer could have reasonably believed that her actions were lawful, in light of the facts and the law as generally understood at the time of her action. *See id.* at 641, 107 S.Ct. 3034.

■ Importantly, the *Anderson* Court held that even where an action could be deemed objectively unreasonable within a Fourth Amendment analysis, when construing the evidence most strongly in favor of the plaintiff (such that a court would generally leave the question, i.e., the genuine issue of material fact on the issue of excessive force, for the jury), that determination does not necessarily require a determination that the action could not in any respect have appeared appropriate and reasonable to a reasonable officer at the time. *Id.* at 643–44, 107 S.Ct. 3034. Thus, while reasonableness in the Fourth Amendment context will frequently be left to the trier of fact to determine, reasonableness in the qualified immunity context "ordinarily should be decided by the court long before trial." *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). The distinction in the latter context is that the analysis turns on the legal issue of whether the law surrounding the particularly defined set of facts was "clearly established," such that no reasonable officer could have thought that her actions were reasonable. *See also Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)(reaffirming that the Fourth Amendment reasonableness inquiry and the qualified immunity reasonableness inquiry are not one and the same).

*Saucier* reaffirmed a principle previously announced in *Anderson,*[9] to wit, even if it is conceded that a genuine issue of material fact exists on the question of whether officers used excessive force, the law may

---

9. The only distinction between the two cases is that *Anderson* concerned an alleged probable cause violation while *Saucier* concerned alleged use of excessive force. As a jury's evaluation of the "reasonableness" of the officer's actions in both situations is governed by the Fourth Amendment, the issues are identical from a constitutional perspective. *See Saucier,* 121 S.Ct. at 2158–59.

not be so well established as to that particular set of facts to enable a court to conclude that in all instances, a reasonable officer would necessarily recognize that her conduct is unreasonable, and thus impermissible and unconstitutional. *"Graham* does not always give a clear answer as to whether a particular application of force will be deemed excessive by the courts." *Id.* at 2158.

In *Saucier,* the lower courts had determined that because a genuine issue of material fact existed as to whether the defendant officer had used excessive force, it could not be determined by the district court on summary judgment that the officer's conduct was reasonable and that he was entitled to qualified immunity. The Supreme Court reversed. The genuine issue of fact was whether the military police officer's "gratuitously violent" shoving of the § 1983 plaintiff, administered when that officer placed the § 1983 plaintiff into a van to whisk him away from a political event where he had been protesting, was reasonable. 121 S.Ct. at 2154, 2159. In addition, prior to the alleged shove, the military officer had, it was alleged, rushed the § 1983 plaintiff away from the area in which the speaker (Vice President Gore) was speaking, "half-walking, half-dragging him, with his feet 'barely touching the ground.'" *Id.* at 2154. Conceding that reasonable minds might disagree on whether the force used was excessive under the circumstances, the Supreme Court nonetheless concluded that under that set of facts, the law was not settled as to whether it was excessive, and, therefore, that a reasonable officer, acting in the heat of the moment, might have found it reasonable to act as he did. *Id.* at 2159–60.

It is important to note that the Court considered the factual nuances in reaching its conclusion:

[The officer] did not know the full extent of the threat [the detainee] posed or how many other persons there might be who, in concert with [him], posed a threat to the security of the Vice President. There were other potential protestors in the crowd, and at least one other individual was arrested and placed into the van with [him]. In carrying out the detention, as it has been assumed the officers had the right to do, [the officer] was required to recognize the necessity to protect the Vice President by securing [the detainee] and restoring order to the scene. It cannot be said there was a clearly established rule that would prohibit using the force [the officer] did to place [the detainee] into the van to accomplish these objectives.

121 S.Ct. at 2160.

Although *Saucier* is consistent with its prior rulings, such as *Anderson* and *Hunter,* what is perhaps confusing about the logic employed therein is that the Court expressly stated that the paradigm of reasonableness that the Court is to use in its qualified immunity analysis, the Fourth Amendment, is the same as that to be used by the jury. 121 S.Ct. at 2160. In effect, what the Court has announced is that, before sending a Fourth Amendment question of disputed fact to the jury in a § 1983 case, it must pre-evaluate the reasonableness question by paying close attention to all of the facts, and even the potential subjective considerations that could have been going through the mind of the defendant officer at the time, and decide whether there is any doubt as to the question of reasonableness. If the plaintiff does not submit, and/or the court cannot find, authority putting beyond doubt the question of whether a reasonable officer should have known that he was violating the § 1983 plaintiff's rights by using excessive force, such that it is *clearly settled,* the Court must allow qualified immunity to attach. This doctrine has the effect of taking some jury questions away from the

jury, but that is precisely why qualified immunity is a principle of *law*, not fact.

An important distinction between *Saucier* and an earlier Sixth Circuit case, *Brandenburg v. Cureton*, 882 F.2d 211 (6th Cir.1989), should be noted. In *Brandenburg*, the Sixth Circuit held that where a genuine issue of fact exists with respect to the conduct of the § 1983 defendant, such that it is impossible to determine without making findings of fact whether the defendant violated a clearly established right, qualified immunity cannot attach on summary judgment. 882 F.2d at 215–16. *Saucier* and *Brandenburg* are not inconsistent. *Saucier* stands for the proposition that, even assuming that the plaintiff's version of the facts is correct, if it *cannot* be firmly concluded, after conducting a detailed evaluation of the defendant's conduct in light of those facts, such as Justice Kennedy did in writing for the Court in *Saucier*, that the law is clearly established as to what is reasonable under those specific circumstances, such that the officer should have known that the § 1983 plaintiff had a clearly established right not to be subjected to that conduct, then qualified immunity must attach; the case should not go to the jury. By contrast, the case should go to the jury, and *Brandenburg* should apply, where the Court *can* firmly conclude, again assuming that the plaintiff's version of the facts is true, that the law is clearly established under those facts, such that the officer should have known that the § 1983 plaintiff had a clearly established right not to be subjected to that conduct. It is then up to the jury to determine just what that conduct was in the final analysis.

For example, assume that the plaintiff alleges that the defendant hit him over the head with his heavy-duty flashlight during an arrest for shoplifting, despite the fact that the plaintiff had put up no resistance. If the defendant denies the allegations and moves for summary judgment on the basis of qualified immunity, the motion would have to be overruled. Not only would there be a genuine issue of material fact on exactly what occurred, but the court would also have no problem finding ample authority holding, if the plaintiff's version of the facts proved to be true, that the defendant's conduct was unreasonable and he should have appreciated the fact that it was unreasonable at the time he was hitting the plaintiff. In other words, on those facts, the law, as well as the plaintiff's rights thereunder, is clearly established. In such a case, *Brandenburg* controls, and *Saucier* is inapplicable.

By contrast, assume that in the example above, the detention of the plaintiff had taken place after a long foot chase, that the plaintiff was assumed by the defendant officer to be armed, and that the plaintiff does not dispute that the chase took place. Assume further that, as it turned out, the plaintiff was not armed, but that he does not dispute he had a lumpy metal object in his back pocket. If the plaintiff alleges that at the end of the chase, the defendant officer tackled him and shoved his head against the ground with excessive force, it might very well present a question of fact for the jury. That is, whether it was reasonable for the defendant to use as much force as the plaintiff alleged he used might be a jury question. However, addressing the question of qualified immunity, the court might determine, after a review of the relevant case law, that the circumstance in which the defendant officer found himself was a novel one which had never been addressed before. If that were the case, the court would likely be required to apply *Saucier*, given that, under that particular set of facts, the line between reasonable force and unreasonable force, and therefore lawful force and unlawful force, is blurred, and not clearly defined in the case law. Accordingly, sum-

mary judgment would be appropriate on the basis of qualified immunity.

■■■■ As for evaluating the contours of the constitutional right in question, the Court looks first to decisions of the Supreme Court, then to decisions of the Sixth Circuit and other courts within the circuit, and finally to decisions of other circuits. *See Comstock v. McCrary,* 273 F.3d 693, 702 (6th Cir.2001).[10] The question in evaluating whether an officer used excessive force is whether, under the totality of the circumstances, he or she was justified in effecting a particular sort of seizure, without regard to that officer's underlying intent or motivation. *See Bass v. Robinson,* 167 F.3d 1041, 1046 (6th Cir.1999)(citing *Graham,* 490 U.S. at 396, 109 S.Ct. 1865). "A person's right to be free against excessive force during the course of an arrest is a clearly established right," *id.* at 1051, but that is not the ultimate question. The ultimate, more particularized question in the qualified immunity context is whether Hummel had a clearly established right *under the facts as he states them.*

■■■ This case falls into the realm of *Brandenburg.* Assuming the truth of Hummel's deposition testimony, the question, for purposes of the qualified immunity analysis, is, *first,* whether it is clearly established that one has the right to be free from an arrest for the charge of resisting arrest where no arrest was attempted in the first instance, and *second,* whether it is clearly established that one has the right to be free from being subdued and physically "thrown" or "shoved" by three police officers where he is neither under arrest nor posing a perceivable threat to the officers, himself, or the public. The Court is of the opinion that the law in this factual context is clearly established, and that no reasonable officer could

honestly doubt that such actions would violate the clearly established rights of the individual.

The concerns expressed by Justice Kennedy in his opinion for the *Saucier* Court, such as the security of the Vice President of the United States and the inability of the defendant officer to have known at the time whether the § 1983 plaintiff was acting by himself or in concert with others, were not the concerns of the officers named herein. Citing *Saucier,* Defendants argue that their conduct was reasonable under the circumstances, at least reasonable enough such that they could not have known that they were being unreasonable. Their argument is not persuasive. Merely citing to *Saucier* is not itself a reason for the Court to recognize the applicability of the qualified immunity doctrine in a given case, and nothing in *Saucier* holds that police will always be immune from § 1983 liability. Had the Supreme Court intended that to be the case, it certainly would have said so. Thus, at some point, even the *Saucier* Court would have to recognize that police can be held liable under § 1983.

Finding where that point lies raises a second reason why the Court does not find Defendants' argument persuasive. As parties moving for summary judgment are wont to do, Defendant officers couch their argument herein within a factual context inclusive of facts which Plaintiff disputes. They argue that they acted reasonably, using only minimal force, and even then only after Plaintiff created a situation in which their safety became an issue. The very premise of this argument is one which the Court may not accept when ruling on summary judgment, because Plaintiff disputes that he did anything to provoke a

---

**10.** Where the issue turns on whether an arrest was made without probable cause, the Court finds that reference to state court cases shedding light on the contours of the charged violation is also a requisite.

physical altercation. Defendants may be stating the truth, but that is for the trier of fact to decide. At the summary judgment stage, the Court must construe the facts and all reasonable inferences in favor of the non-moving party, who in this case is Hummel.

 With respect to the charge of resisting arrest, Defendants have cited no authority supporting the practice of charging an individual for such where there was no arrest to resist. There is a rather small corpus of case law on the matter, but that, no doubt, is the result of there being such an obvious answer to the question. In Ohio, and other states where the question has been addressed, it is established that in order for one to be charged with resisting arrest, there must first be an actual, lawful arrest. In *State v. Barker*, 53 Ohio St.2d 135, 372 N.E.2d 1324, 1328 (1978), the Ohio Supreme Court held that "[a]n arrest occurs when the following four requisite elements are involved: (1) An intent to arrest, (2) under a real or pretended authority, (3) accompanied by an actual or constructive seizure or detention of the person, and (4) which is so understood by the person arrested." As noted above, the officers in this case never had or displayed any intention to arrest Plaintiff. Where there is no arrest, a criminal resisting arrest charge cannot be sustained. *State v. Raines*, 124 Ohio App.3d 430, 706 N.E.2d 414, 415 (1997); *see also State v. Smith*, 2000 WL 381612 (Ohio Ct.App. March 31, 2000); *id.* (Bryant, J., dissenting)(distinguishing "resisting arrest" from "obstructing official business," and opining that while the latter does not hinge on the existence of an arrest, the former does). The other states which have addressed the issue are in accord.[11] On the basis of this authority, and mere common sense, the Court finds it clearly established in the law that probable cause to suspect an individual of resisting arrest cannot exist where there is no arrest in the first instance. In this case, Plaintiff had a clearly established right to be free from being cited for such. Equally so, Officer Allen, the lone citing officer, should have known of this right and is not entitled to qualified immunity to avoid liability on this issue.[12]

 The result is the same with regard to the excessive force issue. It may very well be shown, when all of the facts are known, that the officers acted reasonably. Yet, for the moment, the Court has only Plaintiff's version of the facts to consider. By all accounts, the officers, Officer Allen in particular, were at Plaintiff's residence, on his property, to issue a citation or two, nothing more. According to Plaintiff, even this fact was not articulated to him. At some point, Plaintiff turned to retreat into his home and was apprehended by the three officers. This is troubling, considering Officer Allen did not need Plaintiff to be present in order to issue the citations. (*See* Allen Depo. at 29–32.) Furthermore,

---

11. *See McDonald v. State*, 784 So.2d 261, 268 (Miss.Ct.App.2001)(Southwick, P.J., concurring); *State v. Dossett*, 851 S.W.2d 750, 752 (Mo.Ct.App.1993); *State v. Womack*, 174 Ariz. 108, 847 P.2d 609, 612–14 (1992); *State v. Long*, 802 S.W.2d 573, 575–76 (Mo.Ct.App. 1991); *In the Matter of George B.*, 45 A.D.2d 724, 356 N.Y.S.2d 344, 346 (2d Dep't 1974).

12. Had Officer Allen made it known to Plaintiff that he had entered onto his property for the purpose of issuing a citation, and Plaintiff had still refused to cooperate, an arrest likely would have been warranted under both Ohio statutory law and federal constitutional law. *See* Ohio Rev.Code § 2935.26(A)(2) & (3)(authorizing arrests for minor misdemeanors if the suspect refuses to identify himself or sign the citation); *Atwater v. City of Lago Vista*, 532 U.S. 318, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001)(recognizing that the Fourth Amendment does not bar warrantless arrests for misdemeanors). These authorities provide no help to Defendants in this case given that Plaintiff was never placed under arrest.

Plaintiff never posed a perceivable threat to Officer Allen or the other officers. (*See id.* at 40.) [13] Given that Plaintiff did not pose a threat and was not under arrest, and that his presence was unnecessary for the issuance of the traffic and disorderly conduct citations, the obvious question which arises is why the officers laid a hand on him at all. Add to that the fact that, according to Plaintiff, not one but three officers physically apprehended him, and the even more troubling fact that they "threw" or "shoved" him against his car, and the protections of the qualified immunity doctrine quickly wilt. There is no question in the federal case law that such treatment is clearly unreasonable under the circumstances, and therefore excessive, and all of the officers should have been aware of Plaintiff's right to be safe from as much.

For these reasons, with respect to the qualified immunity issue, Defendants' Motion is OVERRULED.

### C. Liability of the City of Carlisle

 The City of Carlisle cannot be held liable under § 1983 in this instance. A municipality may not be held liable under § 1983 for the wrongful acts of its employees. *See Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiffs must show that the municipality "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct" of Defendant officers. *Leach v. Shelby County Sheriff,* 891 F.2d 1241, 1246 (6th Cir.1989) (quoting *Hays v. Jefferson,*

668 F.2d 869, 872 (6th Cir.1982)). In other words, to hold a municipality liable under § 1983, the municipality itself, pursuant to an official city policy, must directly and proximately cause the plaintiff's deprivation of his constitutional or federal rights. *See Monell,* 436 U.S. at 691, 98 S.Ct. 2018.

Herein, Plaintiff suggests, as a basis for holding the City liable, the authorization granted to Officer Allen by his supervisor, Sgt. Morgan (*see* Allen Depo. at 19), to go to Plaintiff's residence and cite him for the traffic violation and disorderly conduct. (*See* Doc. 16 at 4–5.) This is an insufficient basis, and the authorities cited by Plaintiff for the proposition that "a single act by a policy making official may constitute or reflect a municipal policy" (*id.* at 5) do not support his argument. In simplest terms, Plaintiff has not shown that Sgt. Morgan is any more of a "policy making official" than Officer Allen. *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), cited by Plaintiff, does not help his cause. To be sure, the Supreme Court made clear that local legislatures need not be seen as the exclusive municipal policy makers. *Id.* at 480. That observation, however, does not countenance this Court taking the rather formidable leap of finding a police officer's ranking supervisor a "policy maker" on the ground that he authorized a lower ranking officer to engage in certain conduct. As the *Pembaur* Court remarked, a "policy making" official is one who "must also be responsible for establishing final government policy respecting such activity." *Id.* at 483, 106 S.Ct. 1292.[14] The record does

---

**13.** The officers state in their Motion that they were "concerned for their own safety" (Doc. # 13 at 9) and that their "safety was at risk." (*Id.* at 19.) These statements are merely post-hoc sentiments inserted into their brief for their persuasive effect. Even putting aside the consideration that the Court view the facts and all reasonable inferences in favor of Plaintiff for purposes of ruling on summary

judgment, because these assertions are not supported by the record, and are instead in direct conflict with Officer Allen's deposition testimony, the Court discounts them entirely.

**14.** The Sixth Circuit's opinion in *O'Brien v. City of Grand Rapids,* 23 F.3d 990 (6th Cir. 1994), also cited by Plaintiff, suggests nothing to the contrary. Therein, a two-judge majori-

not even hint that Sgt. Morgan had such a role in the Carlisle government or police department. Accordingly, with respect to Plaintiff's § 1983 cause of action against the City, Defendants' Motion for Summary Judgment is SUSTAINED.

## IV. *Analysis of State Law Claims*

 In addition to the federal claim, Plaintiff asserted five state law tort causes of action: assault, battery, malicious prosecution, false arrest, and trespass. Defendants seek summary judgment on the basis of political subdivision immunity. *See* Ohio Rev.Code § 2744.01 *et seq.* Sections 2744.02 and 2744.03 afford broad immunity from civil tort liability to political subdivisions, excepting this immunity only under limited circumstances not implicated by the facts of this case. As a municipal governmental entity, the City of Carlisle is a political subdivision and therefore immune from tort liability in this instance. As to it, Defendants' Motion is SUSTAINED.

 The immunity of subdivision employees is controlled by § 2744.03. Germane to this case is an exception to immunity, contained in subdivision (A)(6)(b), where the employee acts with malicious purpose, in bad faith, or in a wanton or reckless manner. The same facts which could lead a jury to find that the officers acted unreasonably in their treatment of Plaintiff, for purposes of the Fourth Amendment inquiry, might further give rise to a finding of malice, bad faith, or recklessness. This, in addition to the fact that Defendants proffered no arguments on the merits of these causes of action, compels the Court to find that the merits are for the trier of fact to determine. Therefore, as to Defendant officers, their Motion for Summary Judgment with respect to the state law claims is OVERRULED.

## V. *Conclusion*

Based upon the reasoning and the citations to authority set forth above, the Court hereby SUSTAINS IN PART and OVERRULES IN PART Defendants' Motion for Summary Judgment (Doc. # 13) as follows:

1) The Motion is well taken and SUSTAINED with respect to Plaintiff's § 1983 cause of action to the extent said cause of action is premised upon a claim that he was cited by an officer lacking probable cause to believe he had committed acts constituting obstructing traffic and disorderly conduct, and to the extent it is premised on the liability of the City of Carlisle on all claims; on these issues, there are no genuine issues of material fact, and Defendants are entitled to judgment as a matter of law.

2) The Motion is not well taken and is therefore OVERRULED with respect to the § 1983 cause of action to the extent it is premised on Officer Allen's issuance of a citation for resisting arrest without probable cause to believe Plaintiff had committed such an act and to the extent it is premised on the officers' use of excessive force; on these issues, when the facts are viewed in a light most favorable to Plaintiff, genuine issues of material fact exist in the record that touch upon § 1983 liability,

---

ty found that an arrest protocol training program adopted by the police department had become the *de facto* arrest policy of Grand Rapids (MI) (under certain circumstances). *Id.* at 1002–03. Final discretion for whether the training program was put into practice rested with the Grand Rapids Chief of Police. *Id.* at 1003. Judge Ryan dissented from this opinion, opining that even the police chief had not been vested with policy making authority for the city as a whole. *Id.* at 1002. In any event, even under the *O'Brien* majority's reasoning, Sgt. Morgan would not qualify as a policy making authority for the City or its police department.

and preclude the application of the qualified immunity doctrine.

3) Additionally, the Motion is not well taken and is therefore OVERRULED with respect to the state tort causes of action against the three officers, as genuine issues of material fact exist with respect to the federal claim, over which this Court has original jurisdiction, and with respect to the state claims themselves, over which this Court has supplemental jurisdiction.

Finally, to clarify any confusion on the issue, the Plaintiff is directed to file, within 30 days from date, an amended complaint, clearly stating "use of excessive force" as a basis for his § 1983 claim.