Fred JOHNSON, Plaintiff,

v.

Earl WOLGEMUTH, et al., Defendants.

No. C–3–01–414.

United States District Court,
S.D. Ohio,
Western Division.

March 10, 2003.

---

Dwight Dean Brannon, John Josephy Scaccia, Dayton, OH, for plaintiff.

John Lawrence Shailer, Raymond Joseph Studer, Attorney General of Ohio, Columbus, OH, for defendants.

DECISION AND ENTRY SUSTAINING DEFENDANTS' MOTIONS FOR JUDGMENT ON THE PLEADINGS (DOC. #s 9 & 27), CONSTRUED HEREIN AS MOTIONS TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION; DECISION AND ENTRY OVERRULING, ON PROCEDURAL GROUNDS, PLAINTIFF'S MOTION TO STRIKE AFFIDAVIT OF SAMUEL D. FAULKNER (DOC. #37), BUT ACCEPTING THE LEGAL ARGUMENT STATED THEREIN; DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON THE BASIS OF QUALIFIED IMMUNITY (DOC. #s 19 & 28); CONFERENCE CALL SET

RICE, Chief Judge.

The Plaintiff in this case is Fred Johnson. The Defendants are Earl Wolgemuth, Trent Weaver, Samuel W. Speck, Scott Zody and the Ohio Department of Natural Resources, Division of Wildlife ("ODNR"). (Johnson has also named several John Doe Defendants who have yet to be identified.) Wolgemuth and Weaver are or were law enforcement officers with the ODNR during the relevant time period, Speck is or was the Director of the ODNR, and Zody is or was responsible for oversight of the Division of Wildlife. The individual Defendants have been named in both their individual and official capacities. (Compl.(Doc.# 1) ¶ 6.)

This case arises out of circumstances surrounding the Defendants' alleged investigation of an illegal killing of a deer on farm property owned and occupied by Johnson. In his Complaint (Doc. # 1), Johnson sets forth nine counts: (1) assault, under the common law of Ohio, stated as to Wolgemuth and Weaver, and as-of-yet-

unnamed John Doe Defendants (First Cause of Action); (2) battery, under the common law of Ohio, stated as to Wolgemuth and Weaver, and as-of-yet-unnamed John Doe Defendants (Second Cause of Action); (3) unlawful restraint, false arrest and false imprisonment, under the common law of Ohio, stated as to Wolgemuth and Weaver, and as-of-yet-unnamed John Doe Defendants (Third Cause of Action); (4) deprivation of civil rights, as guaranteed by 42 U.S.C. § 1983, stated as to Wolgemuth, Weaver, the ODNR and as-of-yet-unnamed John Doe Defendants (Fourth Cause of Action); (5) negligent supervision, under the common law of Ohio, stated as to Speck, Zody and the ODNR (Fifth Cause of Action); intentional infliction of emotional distress, under the common law of Ohio, stated as to all Defendants (Sixth Cause of Action); (7) conspiracy to commit unlawful acts against Plaintiff, under the common law of Ohio, stated as to all Defendants (Seventh Cause of Action); (8) malicious prosecution, under the common law of Ohio, stated as to all Defendants (Eighth Cause of Action); and (9) abuse of process, stated as to all Defendants (Ninth Cause of Action).

Currently, several Motions are at issue. The Defendants have filed Motions for Judgment on the Pleadings (Doc. # s 9 & 27) and Motions for Summary Judgment Based Upon Qualified Immunity (Doc. # s 19 & 28).[1] For his part, the Plaintiff has filed response memoranda to these Motions (Doc. # s 15, 31 & 32), and a Motion to Strike Affidavit of Samuel D. Faulkner (Doc. # 37), the referenced affidavit being one filed by the Defendants in support of their Motion for Summary Judgment, at-

tached to their Reply Memorandum (Doc. # 34).

The Court will first discuss the Motion for Judgment on the Pleadings, and then turn to the Defendants' Motion for Summary Judgment Based Upon Qualified Immunity and the Plaintiff's Motion to Strike.

## I. *Defendants' Motion for Judgment on the Pleadings Under Fed.R.Civ.P. 12(c) (Doc. # s 9 and 27)*

A party is allowed to move for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure once the pleadings have been closed, as they are at this time in this case. In reviewing such a motion, the Court "must construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claim that would entitle him to relief." *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 512 (6th Cir.2001).

The Defendants' Motion for Judgment on the Pleadings has two distinct bases. *First,* they contend that they are entitled to judgment to the extent they have been named as divisions or officials of the State of Ohio. *Second,* to the extent they are not entitled to judgment under the Eleventh Amendment, they contend that they are entitled to judgment insofar as they have been sued under the common law of Ohio. Although the Court agrees with both arguments set forth by the Defendants, it does not agree with the procedural mechanism invoked for dismissal. Their Motion

1. Defendant Wolgemuth was served at a later date than the other Defendants, and, as a result, did not join in their initial Motion for Judgment on the Pleadings (Doc. # 9). However, his subsequently filed, individual Motion for Judgment on the Pleadings (Doc. # 27) is a mere restatement of that filed by the other

Defendants. Accordingly, in the body of this opinion, the Court will hereinafter refer to their separate Motions as a single Motion. This will also be true with respect to their separate Motions for Summary Judgment Based Upon Qualified Immunity (Doc. # s 19 & 28).

should have been brought pursuant to Fed. R.Civ.P. 12(b)(1), not 12(c). Despite that procedural deficiency, the common practice in federal district courts is to treat motions such as the Defendants' as Rule 12(b)(1) motions, and rule accordingly, instead of requiring a defendant to file a properly stated motion to dismiss under Rule 12(b)(1). This Court will do the same.[2]

The Eleventh Amendment to the United States Constitution states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." This immunity extends to states against suits brought by their own citizens (even though the text does not expressly state as much). *See Alden v. Maine,* 527 U.S. 706, 728–29, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999); *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Though not technically a jurisdictional issue, in that Eleventh Amendment protections may be waived by a state, *see Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997), where such is not waived, as is the undisputed case herein, the Supreme Court has treated a state's absolute protection from suit as tantamount to a jurisdictional bar to a federal court's ability to hear the case. *See, e.g., Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 76, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

■ The ODNR and the individual Defendants, to the extent they have been named in their official capacities, cannot be sued in this Court, given that they are mere divisions or officials of the State and any funds which would be obligated to satisfy a judgment against them in such capacity would come from the treasury of the State. *See Hafer v. Melo,* 502 U.S. 21, 26, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *Cory v. White,* 457 U.S. 85, 89, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982); *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Worcester County Trust Co. v. Riley,* 302 U.S. 292, 296, 58 S.Ct. 185, 82 L.Ed. 268 (1937).

■ With regard to their second stated basis for judgment on the pleadings, the Court first turns to the controlling statutes. Ohio Rev.Code 9.86 states:

Except for civil actions that arise out of the operation of a motor vehicle and civil actions in which the state is the plaintiff, no officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, *unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner.*

This section does not eliminate, limit, or reduce any immunity from civil liability that is conferred upon an officer or employee by any other provision of the Revised Code or by case law. This section does not affect the liability of the state in an action filed against the state in the court of claims pursuant to Chapter 2743. of the Revised Code.

(Emphasis added.)

Section 2743.02(F) states in relevant part:

---

**2.** The difference is more than semantical. "Judgment" under Rule 12(c) would bar the Plaintiff from seeking the relief sought in a state court, pursuant to the principle of *res*

*judicata.* "Dismissal" under Rule 12(b)(1), in contrast, will not have the same preclusive effect.

A civil action against an officer or employee [of the State of Ohio], that alleges that the officer's or employee's conduct was manifestly outside the scope of the officer's or employee's employment or official responsibilities, or that the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner shall first be filed against the state in the court of claims, which has exclusive, original jurisdiction to determine, initially, whether the officer or employee is entitled to personal immunity under section 9.86 of the Revised Code and whether the courts of common pleas have jurisdiction over the civil action.

The Supreme Court of Ohio has held that § 2743.02(F) "vests exclusive original jurisdiction in the Court of Claims to determine whether [a state officer or employee] is immune from suit." *State ex rel. Sanquily v. Court of Common Pleas of Lucas County*, 60 Ohio St.3d 78, 573 N.E.2d 606, 609 (1991). The Sixth Circuit, too, has recognized this principle. *See Cameron v. Children's Hosp. Med. Ctr.*, 131 F.3d 1167, 1171 (6th Cir.1997); *Haynes v. Marshall*, 887 F.2d 700, 705 (6th Cir.1989) ("Until the Ohio Court of Claims determines that [the state employee defendants] are not immune, there is no cause of action cognizable under Ohio law over which the district court can assert pendent jurisdiction."). Accordingly, Johnson's claims arising under the common law of Ohio must be dismissed. This Court cannot assert supplemental jurisdiction over same until it has first been determined, by the Ohio Court of Claims, that the individual defendants' "actions were manifestly outside the scope of [their] employment or official responsibilities, or un-

less the [individual Defendants] acted with malicious purpose, in bad faith, or in a wanton or reckless manner," as provided in Ohio Rev.Code § 9.86.[3]

For the reasons stated, to the extent Johnson has stated claims against the ODNR and against the individual Defendants in their official capacities, his claim is barred by the Eleventh Amendment. Furthermore, to the extent he has stated claims arising under the common law of Ohio against the individual Defendants, regardless of the capacity in which they were named, the Court cannot take supplemental jurisdiction until the Ohio Court of Claims has first determined whether said Defendants are amenable to suit. Accordingly, the Court will construe the Defendants' Motion for Judgment on the Pleadings, brought pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, as a motion to dismiss under Rule 12(b)(1), and will SUSTAIN same.

What this means is that only Johnson's Fourth Cause of Action, for deprivation of his civil rights, actionable under 42 U.S.C. § 1983, stated as to Wolgemuth and Weaver (and as-of-yet-unnamed John Doe Defendants), remains viable, and only to the extent they have been named in their individual capacities. With regard to that claim, the Court will proceed to consider the Defendants' Motion for Summary Judgment and the Plaintiff's Motion to Strike.

II. *Defendants' Motion for Summary Judgment (Doc. # s 19 and 28) and Plaintiff's Motion to Strike Affidavit of Samuel D. Faulkner (Doc. # 37)*

Although Johnson cannot proceed against the ODNR, nor the individual De-

---

**3.** Of course, Johnson is still free to assert any of the facts underlying his common law claims to support his § 1983 claim against the individual Defendants, as sued in their individual capacity; it is the maintaining of separate common law claims arising from such facts which he may not do.

fendants to the extent they have been sued in their official capacities and to the extent they have been sued under the common law of Ohio, he may proceed against Weaver and Wolgemuth in his § 1983 action (Fourth Cause of Action), to the extent they have been named in their individual capacities. *See Hafer v. Melo,* 502 U.S. 21, 25–27, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) (holding that a state official can be held individually liable under § 1983 for acts taken within the scope of his or her official duties).[4] After setting forth the facts and the standard for ruling on a motion for summary judgment, the court will consider the parties' arguments.

## A. *Factual Background*[5]

Johnson is 54 years old and resides on about 70 acres of farm property in Germantown, Montgomery County, Ohio. (Johnson Aff, attached to Pl.'s Memo. in Resp. (Doc. # 32), ¶¶ 3 & 5.) His address is 10232 State Route 123 ("SR 123"). (*Id.* ¶ 5.) While his property abuts SR 123, what he considers to be his actual farm sits back about a quarter of a mile from the road, and is enclosed by a fence. (*Id.* ¶ 5.) A one-half mile driveway runs from SR 123 back to his house, and ingress and egress is blocked by a locked gate which connects with the fence surrounding his property. (*Id.*) Also located on the farm property is a second residential home, the address of which is 10240 SR 123. (*Id.*)

Weaver and Wolgemuth were at all relevant times Wildlife Officers with the ODNR. (Weaver Aff., attached to Doc. # 19, ¶¶ 1 & 2; Wolgemuth Aff., attached to Doc. # 19, ¶ 2.) At about 6:30 a.m., on October 16, 2000, Johnson and his girlfriend, driving in separate vehicles, were met at the locked driveway gate by Defendants Weaver and Wolgemuth. (Johnson Aff. ¶ 7.) The Defendants had apparently climbed over the gate because they were standing on its inside when Johnson's girlfriend approached them first with the intent to exit the property. (*Id.*) The Defendants were there to investigate a possible illegal deer shooting. (Weaver Aff. ¶¶ 2–6.) The day before, Weaver had received a report from a deer processing plant that a deer had been brought in for processing with a bullet lodged inside of it. (*Id.* ¶¶ 3 & 4.) This was a concern because, at the time, it was only archery deer hunting season in Ohio. (*Id.* ¶ 4.) The Defendants were led to Johnson's property by the identification tag on the deer, identifying the hunter as Jeremy MacIntosh, at 10240 SR 123. (*Id.* ¶ 5.) MacIntosh has stated that he is Johnson's stepson. (Tunnell Aff., attached to Doc. # 19, at Attachment 2.)

When Johnson arrived at the gate in his pickup truck, the Defendants approached him and inquired as to whether he was MacIntosh. (Johnson Aff. ¶ 9.) He informed them that he was not and that Jeremy had gone fishing, but that if they would call him at his automobile repair shop later in the day, he would contact MacIntosh and arrange for them to speak with him. (*Id.*) In the meantime, the Plaintiff informed the Defendants that he had to get to work, and that they were to leave his property. (*Id.*) After he asked

---

**4.** The theory advanced to support this holding is that an official who violates another's federal or constitutional rights while acting under "a badge of authority of a State" is not acting within his "official capacity" at the moment he commits the violation, because no office would condone such an act. *See Hafer,* 502 U.S. at 28, 112 S.Ct. 358; *Med Corp., Inc. v.*

*City of Lima,* 296 F.3d 404, 417 (6th Cir. 2002).

**5.** For purposes of ruling on the Defendants' Motion for Summary Judgment, the Court will construe the facts, and all reasonable inferences drawn therefrom, in the light most favorable to the Plaintiff, who is the non-moving party.

them to move their own vehicle, which was parked on the outside of the locked gate, so that he and his girlfriend might make their way past them, the Defendants complied, but only so far as a railroad right-of-way just off his property. (*Id.* ¶¶ 11 & 12.)

After unlocking the gate so that he and his girlfriend could exit his property, and then re-locking it behind him, Johnson approached the Defendants, both of whom were sitting in their vehicle. (*Id.* ¶ 12.) The Defendants informed Johnson that they intended to re-enter his property to speak with MacIntosh, to which Johnson replied that he had to get to work and that they did not have his consent to do so. (*Id.* ¶ 13.) When Johnson told the Defendants that he intended to call the police, they uttered expletives and announced that they were the law. (*Id.*) Johnson insisted that he intended to do so anyway, and walked back toward his truck, with his back turned toward the Defendants. (*Id.*) Shortly thereafter, as Johnson neared his car, he was grabbed in a bear hug from behind by Wolgemuth, who had shouted more expletives and informed Johnson that he was "going down." (*Id.* ¶ 14.) Johnson told Wolgemuth that he had a bad back, but Wolgemuth, soon thereafter joined by Weaver, threw him against his pickup truck and attempted to throw him to the ground. (*Id.;* Weaver Aff. ¶ 11.) Johnson did not put up a fight, and was unsure why the Defendants were using physical force. (Johnson Aff. ¶ 16.) At some point, the Defendants sprayed pepper spray or mace in Johnson's eyes, wrestled him to the ground, and handcuffed him, first to a roll of field fence, and finally with his hands behind his back. (*Id.* ¶ 15; Weaver Aff. ¶¶ 15 & 16.) The Defendants continued to yell expletives at Johnson, and refused to treat him with mace "reversal" spray for several more minutes, until

the arrival of Montgomery County Sheriff's deputies and the Chief of the Germantown Police, who had been summoned by Weaver. (Johnson Aff. ¶ 15; Weaver Aff. ¶¶ 10–19.)

Johnson was not armed, and, up to the point that the other law enforcement officers arrived, had not been informed of the basis for his detention. (Johnson Aff. ¶ 17; Weaver Aff. ¶ 18.) About 15 minutes had passed since the time Johnson had approached the Defendants after re-locking the driveway gate and the arrival of the other law enforcement officers. (Weaver Aff. ¶ 19.) He was eventually arrested, taken to the Montgomery County Jail, and booked under § 1533.67 of the Ohio Revised Code, for interfering with and resisting a wildlife officer's authority, both of which are first-degree misdemeanors under § 1533.99(C). (Johnson Aff. ¶¶ 18 & 19; Weaver Aff. ¶ 21.)

After booking Johnson into the County Jail, Weaver and Wolgemuth met with Investigator James R. Tunnell, of the ODNR, Division of Wildlife, and together returned to Johnson's property with the purpose of contacting MacIntosh. (Weaver Aff. ¶ 22.) They proceeded up the driveway and were greeted by MacIntosh at his door. (*Id.* ¶ 23.) [6] The Defendants, Investigator Tunnell, and MacIntosh, then proceeded to walk and inspect the farm property, including its outbuildings, as MacIntosh explained how the deer identified at the processing plant had been killed. Eventually, they identified the location where they believed the deer had been felled, marked by deer fur and blood. (*Id.* ¶ 25.) At first, MacIntosh stated that he had killed the deer with a bow and arrow, but eventually he capitulated, and stated, in writing, that Johnson had killed the

---

**6.** It is unclear how the Defendants and Investigator Tunnell got past the locked gate, and whether they were greeted by MacIntosh at 10240 SR 123 or 10232 SR 123.

deer with a 12 gauge shotgun. (*Id.* ¶¶ 23–26; Tunnell Aff. at Attachment 2.)

MacIntosh stated in his signed, written statement, that on Saturday, October 7, 2000, Johnson, his stepfather, killed a 16 point buck on the farm in Germantown. (Tunnell Aff. at attachment 2.) According to MacIntosh, Johnson told him that he had shot the buck with a shotgun, but did not want to tag it and take it in for processing himself. (*Id.*) Because MacIntosh wanted the deer for himself, he and Johnson took it to a deer checking station in Johnson's pickup, where he informed the person in charge of intake that he had personally killed the deer with a bow and arrow. (*Id.*) Later, they took the carcass to the deer processor's, and the head to a taxidermist in Carlisle, Ohio. (*Id.*)

Around 11:00 a.m., Johnson posted bail and returned to his property, where he again discovered Weaver and Wolgemuth on his property without his permission. (Johnson Aff. ¶¶ 20 & 22; Weaver Aff. ¶ 27.) Upon seeing Johnson, the Defendants and Investigator Tunnell ran off his property. (Johnson Aff. ¶ 20; Weaver Aff. ¶ 28.) Shortly thereafter, Johnson received a telephone call from the Defendants telling him that they "had bigger fish to fry" and that he should forget about the occurrences of that day. (Johnson Aff. ¶ 25.) He told them that he would not forget about it. (*Id.*) Around 2:30 p.m., Weaver and Wolgemuth went to the Miamisburg Municipal Court and filed another misdemeanor charge of interference against Johnson. (Weaver Aff. ¶ 30.)

They then appeared in the Miamisburg Municipal Court and obtained a search warrant to search the residence at 10240 SR 123. (*Id.* ¶ 31; search warrant, attached to Weaver Aff.) [7]

The affidavit for the search warrant stated that the legal violation being investigated was the illegal taking of a deer, under Ohio Rev.Code § 1531.02. Under the caption, "Property to be searched for and seized," it described 10240 SR 123 as follows: "A 2–story brown brick with attached garage. The house has a brown roof. House has a black cattle fence on the east, south and west side." It further stated that both the described house and all outbuildings and vehicles were to be searched. On the backside of the affidavit, an added notation indicated that the items to be seized were all 12–gauge shotguns, any parts of a wild animal, and wild animals which were not "legally possessed." [8] Describing the grounds for probable cause, the affidavit stated that the Defendants "obtained a written statement from Jeremy MacIntosh implicating both himself and his stepfather, Fred Johnson, in various deer violations." It reported that MacIntosh had stated that Johnson had killed the deer in question with a 12–gauge shotgun, and that the Defendants and Investigator Tunnell had located a shotgun casing and deer remains. It further stated that MacIntosh had indicated that the shotgun in question was kept inside the house, and that the deer (presumably the trophy head) was kept in one of the outbuildings.

7. A cleaner copy of the search warrant is attached as Attachment B to Defendants' Reply Memorandum (Doc. # 34).

8. Johnson argues that the affidavit and search warrant did not state what items were to be seized. The Court disagrees. As noted, it stated as much on the backside. Furthermore, in his affidavit attached to the Defendants' Motion for Summary Judgment, Weaver authenticated the affidavit and search warrant at issue in this case, both of which are incorporated into a single form document. Johnson has not argued that the document presented to the Court by Weaver is not an accurate depiction of the original, or that the notation on its backside, specifically listing the items to be seized, was not part of the original.

At approximately 5:00 p.m., the Defendants, with other law enforcement officers from the ODNR and the Germantown Police Department, returned to Johnson's property. (Weaver Aff. ¶ 32.) Although they had a search warrant to search the residence at 10240 SR 123, they nevertheless searched Johnson's residence at 10232 SR 123 for about an hour, while Johnson and his girlfriend were detained outside. (Johnson Aff. ¶ 28; Weaver Aff. ¶ 34.) Johnson was told he would not be permitted to accompany the officers conducting the search unless he agreed to be handcuffed, which he did not. (Weaver Aff. ¶ 35.) The officers conducting the search seized three shotguns and some shells. (Johnson Aff. ¶ 29; Weaver Aff. ¶ 32.) The seized items were delivered to the Ohio Bureau of Criminal Investigation and Identification, which identified one of the three shotguns as the weapon that fired the slug which killed the deer in question. (Weaver Aff. ¶ 33.) The Plaintiff was prosecuted under Ohio Rev.Code § 1531.02, but the charges were subsequently dismissed. (Compl. ¶¶ 32 & 71; Answer of Defendants Weaver, Zody, Speck, and the ODNR (Doc. # 6) ¶¶ 32 & 71.)

B. *Standard for Ruling on a Motion for Summary Judgment*

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial") (quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law, Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Serv., Inc. v. Babin,* 18 F.3d 337, 341 (6th Cir.

1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Sys.,* 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ..."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

### C. *Analysis*

■ Before the Court addresses the Defendants' Motion for Summary Judgment, it will discuss the Plaintiff's Motion to Strike Affidavit of Samuel D. Faulkner. Faulkner is a career law enforcement officer in Ohio, and currently teaches at the Peace Officer Training Academy, under the auspices of the Ohio Attorney General's Office. (Faulkner Aff, Doc. # 34 at Attachment A.) In their Reply Memorandum, the Defendants attached Faulkner's affidavit for purposes of providing "expert opinion" on the legality of the conduct of Weaver and Wolgemuth on October 16, 2000, in relation to their dealings with Johnson. Johnson objects to this affidavit, which reads as an expert's report, on the ground that it is inadmissible opinion testimony. The Defendants contend that Faulkner is an expert in law enforcement techniques and that he may opine on whether Weaver and Wolgemuth acted reasonably under the circumstances of this case.

Without deciding at this juncture whether an individual with Faulkner's training might be allowed to testify at trial on matters of police conduct and training, his

affidavit cannot be considered at this juncture for several reasons. *First,* as a procedural matter, it was not attached to the Defendants' primary brief, and Johnson had no opportunity to respond. *Second,* it is apparent that Faulkner did not view the facts in a light most favorable to Johnson in assessing the conduct of the Defendants, as the Court must when ruling on summary judgment. *Third,* and most significantly, the Court agrees with Johnson that Faulkner's affidavit serves no other purpose than to usurp the role of the Court in deciding whether the material facts, when viewed in a light most favorable to Johnson, are in dispute, creating genuine issues for the trier of fact. The Defendants state in their Response Memorandum: "Mr. Faulkner's affidavit is to assist the Court determine the qualified immunity question of law.... Mr. Faulkner reviewed the officers' actions with respect to his teachings and their training, and found those actions to be reasonable." (Doc. # 41 at 3.) With all due respect to Faulkner and his education and experience, it is the Court's role to decide the question of reasonableness at the summary judgment stage of litigation, not that of an expert.

Be that as it may, the remedy is not to strike his affidavit; it is simply to ignore it.[9] Accordingly, Johnson's Motion to Strike the Affidavit of Samuel D. Faulkner is OVERRULED. That said, the Court is nevertheless in complete agreement with Johnson that the affidavit may not, and will not, be considered.

In his Fourth Cause of Action, Johnson avers that Weaver and Wolgemuth and other as-of-yet unnamed John Does violated his rights under the laws and Constitution of the United States. 42 U.S.C. § 1983 provides a civil cause of action to any citizen of the United States against any person who, under color of state law, deprives the citizen of "any rights, privileges, or immunities secured by the Constitution and laws of the United States." *See Christy v. Randlett,* 932 F.2d 502, 504 (6th Cir.1991) (citations omitted). In order to succeed on a § 1983 claim, a plaintiff must prove two elements: (1) that he was deprived of a right secured by the Federal Constitution or laws of the United States; and (2) that he was subjected to this deprivation by a person acting under the color of state law. *See Searcy v. City of Dayton,* 38 F.3d 282, 286 (6th Cir.1994). "By its terms, § 1983 creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *Gardenhire v. Schubert,* 205 F.3d 303, 310 (6th Cir.2000) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

The focus of the parties' respective arguments is three-fold, each giving individual treatment to the legality of the Defendants' conduct during the three distinct confrontations they had with Johnson on October 16, 2000. The Court will follow their lead, and shape its discussion accordingly. Before it does so, it will note that the Defendants' argument as to all of the events is that they did not violate any constitutional right of Johnson, and that, even if they had, they are entitled to qualified immunity.

In the interest of protecting public officers in the course of performing their discretionary duties from unduly onerous lawsuits under § 1983, the Supreme Court has recognized "qualified immunity" for such officers, "shielding them from civil damages liability as long as their actions

---

**9.** Rule 12(f) of the Federal Rules of Civil Procedure allows a court to strike certain matter contained within the "pleadings." Johnson did not identify the procedural underpinning for his Motion, but to the extent he intended it to be Rule 12(f), it is not well taken.

could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Thus, in order for public officer to be held accountable, the right she is charged with violating must be clearly established, and be one of which a reasonable officer in her position would have known. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

The Supreme Court has established a two-part analysis for assessing whether a public official is entitled to qualified immunity. *See Crockett v. Cumberland College,* 316 F.3d 571, 579 (6th Cir.2003). *First,* the Court must inquire whether the facts alleged, when viewed in the light most favorable to the party asserting the injury, show that the public official's conduct violated a constitutional right. *Id. Second,* if the denial of a constitutional right is demonstrated, the Court must assess whether that right was clearly established at the time of the alleged violation. Importantly, the "clearly established law" that forms the focal point of the Court's inquiry must be defined with particularity, and not in the abstract. *See Anderson,* 483 U.S. at 639–40, 107 S.Ct. 3034. For instance, it is not enough to say that because the *general* right to due process as guaranteed by the Due Process Clause is clearly established, any specific action later found to be violative of the Due Process Clause is *per se* violative of a "clearly established" right. *See id.* at 639, 107 S.Ct. 3034. Rather, a court must more closely scrutinize "the contours" of the right allegedly violated; it must attempt to analyze the right allegedly violated in a particularized, less generalized, context, i.e., in light of the specific facts of the lawsuit under scrutiny. Stated simply, the relevant question is whether an officer could have reasonably believed that her actions were lawful, in light of the facts and the law as generally understood at the time of her action. *See id.* at 641, 107 S.Ct. 3034.

### 1. The Morning Confrontation

The question with respect to the morning confrontation, which was the initial contact Weaver and Wolgemuth had with Johnson as he was leaving for work, is whether the Defendants had probable cause to arrest him and whether, in detaining and arresting him, they used excessive force. From the outset, the Court will remind the Defendants that despite their best attempts to portray Johnson as belligerent and uncooperative on the morning of October 16, 2000, it is Johnson's (quite different) version of the events which the Court must accept for purposes of ruling on their Motion for Summary Judgment. *E.g., Hinchman v. Moore,* 312 F.3d 198, 205 (6th Cir.2002). The Court will consider the issues of probable cause and excessive force separately.

#### a. probable cause

■ There is no dispute that Johnson was arrested, and Weaver himself acknowledges that the decision was made while he and Wolgemuth were still seated in their vehicle, prior to any physical altercation with Johnson. (Weaver Aff. ¶ 10.) The only basis for the arrest was that Johnson was being recalcitrant, in that he was refusing to permit the Defendants from entering onto his property to speak with MacIntosh, who he insisted was not there in any event. (*Id.*)

"For a police officer to have probable cause for arrest, there must be 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense.' " *Crockett,* 316 F.3d at 580 (quoting *Michi-*

*gan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979)). Whether an officer could have had probable cause to believe criminal activity was afoot requires an examination of all facts and circumstances within the officer's knowledge at the time of an arrest. *See id.* Again, however, when a Court reviews "all facts and circumstances within the officer's knowledge at the time of an arrest" in ruling on a motion for summary judgment, its view of those facts and circumstances is shaped by the non-moving party's version of same. Unless there is only one reasonable determination possible, the question of whether probable cause existed is for the trier of fact. *See id.* at 581.

The starting point in determining whether an officer could have had probable cause is the language of the criminal statute under which the plaintiff was charged. *See id.* In this case, the statute at issue is Ohio Rev.Code § 1533.67, which reads in pertinent part:

> No person shall interfere with, threaten, abuse, assault, resist, or in any manner deter or attempt to deter a wildlife officer or any other officer having like authority from carrying into effect any law or division rule governing the taking, possession, protection, preservation, or propagation of wild animals * * * *

According to Johnson, the Defendants were already on the inside of his locked driveway gate, itself located about a quarter of a mile inside his property line, when they first confronted him. He asked them to leave so that he could go to work, and requested that they not attempt to re-enter his property without his permission. An arrest ensued. The Court agrees with Johnson that to the extent his version of the facts is correct, which the Court must accept for purposes of ruling on summary judgment, a trier of fact could find that Weaver and Wolgemuth did not have prob-

able cause to believe he was violating § 1533.67.

At that early hour, Johnson himself was not under investigation for the shooting of the deer. It was his property, and it can hardly be argued, at least in the absence of exigent circumstances or some other legal exception not relevant to the facts of this case, that peace officer or no, an individual has no right to enter onto the private property of another if permission by the owner has been denied. The Defendants argue that they were entitled to enter onto his land. With respect to MacIntosh, the Defendants were investigating the killing of a deer with a shotgun out of season, per regulations set forth in the Ohio Administrative Code. Under Ohio law, "[a]ny regularly employed salaried wildlife officer may enter any private lands or waters if the wildlife officer has good cause to believe and does believe that a law is being violated." Ohio Rev.Code § 1531.13. That section further states:

> A wildlife officer, sheriff, deputy sheriff, constable, or officer having a similar authority may search any place which the officer has good reason to believe contains a wild animal or any part of a wild animal taken or had in possession contrary to law or division rule, or a boat, gun, net, seine, trap, ferret, or device used in the violation, and seize any the officer finds so taken or possessed. *If the owner or person in charge of the place to be searched refuses to permit the search, upon filing an affidavit in accordance with law with a court having jurisdiction of the offense and upon receiving a search warrant issued, the officer forcibly may search the place described,* and if in the search the officer finds any wild animal or part of a wild animal, or any boat, gun, net, seine, trap, ferret, or device in the possession of the owner or person in charge, contrary to this chapter or

Chapter 1533. of the Revised Code or division rule, the officer shall seize it and arrest the person in whose custody or possession it was found.

(Emphasis added.) Curiously, in citing this provision, the Defendants omitted the portion of the text emphasized ·herein by the Court. (Doc. # 19 at 21.) [10]

Johnson having indicated only that they were not to go onto his property, the Defendants arrested him for "interfering with" and "resisting" their investigation of MacIntosh. The case law in Ohio dealing with § 1533.67 is sparse, to say the least. The Court has found only one appellate decision discussing the meaning of the term "interfere," and no decisions discussing the term "resist." Finding the statutory terms not defined in the General Assembly, the Third District Court of Appeals turned to the American Heritage Dictionary for the "plain meaning" of that term, and held that it meant "to come between so as to be a hindrance or obstacle; impede .... to prevent or discourage from acting, as by means of fear or doubt." *State v. Vanover*, 1998 WL 12683, at *3 (Ohio Ct.App. Jan. 12, 1998). In that case, the facts revealed that an ODNR officer had actively pursued a hunter for hunting on private lands without permission of the owner, in violation of Ohio Rev.Code § 1533.17. The hunter actively avoided the officer to elude a citation. *Id.* at *1. It was only later, after tracking down the hunter at his home, that the officer was able to issue a citation for hunting without permission, and, in doing so, add a charge for "deterring or interfering with a wildlife officer." *Id.*

The hunter was convicted at a bench trial, and the Court of Appeals affirmed.

Viewing the facts in a light most favorable to Johnson, there is more than ample reason to believe that the Defendants did not have probable cause to arrest him for either "interfering with" or "resisting" their efforts to "[carry] into effect any law or division rule governing the taking, possession, protection, preservation, or propagation of wild animals." *First*, according to Johnson, MacIntosh was not on the property at the time, so if the terms of § 1533.67 are to be understood for their plain meaning, the Defendants cannot argue that Johnson either "interfered with" or "resisted" their efforts to carry the ODNR laws into effect. *Second*, even if MacIntosh had been on the property, or even if the Defendants reasonably suspected him to be, because the criminal activity they were investigating was completed (i.e., the deer was already shot and killed), they could not have had "good cause to believe ... that a law [was] being violated" at that time, on Johnson's property. Ohio Rev.Code § 1531.13. *Third*, as § 1531.13 makes clear in no uncertain terms, their right to enter onto his property to search for any remains of the deer, such as the trophy head, is qualified: without his permission, they could only do so with a search warrant, which they did not have at that point in the day.

Having found that the facts, and all reasonable inferences that can be drawn therefrom, when viewed in a light most favorable to Johnson, could support a finding that the Defendants lacked probable cause to believe he was committing a crime

---

**10.** In truth, the Defendants citation to this statute is inserted in their argument on the constitutionality of the second confrontation of the day. They did not submit an argument on the probable cause issue as it related to the morning confrontation, instead concentrating on issues of illegal search and seizure and excessive force. They miss the point, both in their primary memorandum and their Reply. The legality of his morning arrest is a cornerstone of the Plaintiff's cause of action, and the existence of probable cause at that point cannot be glossed over as if it is not at issue.

at the time they arrested him, the next question is whether the right they violated was clearly established. As noted above, the Court must define the right with particular reference to the facts of this case. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Gragg v. Kentucky Cabinet for Workforce Dev.,* 289 F.3d 958, 964 (6th Cir.2002). "For the right to be clearly established the case law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Id.*

■ The general rule is that the Court is to look to decisions of the Supreme Court and the Sixth Circuit to determine whether a particular right is clearly defined, but as both this Court and the Sixth Circuit have recognized, when the question presented is whether an officer arrested the § 1983 plaintiff without probable cause, it is necessary to examine both the state law and how the state appellate courts have discussed the elements of that law for purposes of demonstrating probable cause. *See Hummel v. City of Carlisle,* 229 F.Supp.2d 839, 854 n. 10 (S.D.Ohio 2002); *Crockett,* 316 F.3d at 581; *Estate of Dietrich v. Burrows,* 167 F.3d 1007, 1010–12 (6th Cir.1999). This must be so, because the probable cause inquiry turns on the elements of state criminal laws, and it is, for the most part, only the state courts which have opportunity to construe such laws.

As noted, the only case out of Ohio which the Court can find discussing any of the relevant particulars of § 1533.67 is *Vanover, supra,* and, needless to say, the Court has found no federal cases discussing the law. Yet, the Court does not believe that the lack of cases discussing probable cause with respect to this particular, and somewhat obscure, Ohio statute, necessitates a finding that the alleged violation of Johnson's right to be free from arrest without probable cause was not clearly established and that the Defendants are therefore entitled to qualified immunity. The cases need only make the right possessed by Johnson apparent. *See Burrows,* 167 F.3d at 1012; *Gragg,* 289 F.3d at 964. When viewed in light of the facts discussed above, which have been construed in Johnson's favor for purposes of ruling on the Defendants' Motion, there can be little doubt that Weaver and Wolgemuth were aware that they could not simply enter onto a private landowner's property and demand access, given that (1) they were told the person they were investigating was not present, (2) the reported criminal activity they were investigating had been completed and therefore required no immediate action,[11] and (3) they did not have a search warrant to search for any parts of the deer that reportedly had been shot out of season. In light of these facts, construed in a light most favorable to Johnson, the Defendants did not possess probable cause to arrest him, and his right to be free from such an arrest was clearly established.

b. *excessive force*

■ An excessive force claim triggers the Fourth Amendment's guarantee of the right to be secure in one's person. *See*

---

**11.** It is not enough for a law enforcement officer to argue that without the right of immediate entry, a property owner could destroy suspected contraband. Something

more must be shown, lest the Fourth Amendment's requirement of a search warrant be swallowed by the "exigent circumstances" exception.

*Graham v. Connor,* 490 U.S. 386, 394–95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (holding that whether an officer's force was reasonable must be analyzed under the reasonableness standard of the Fourth Amendment). "[S]ome degree of physical coercion or threat thereof" is constitutionally acceptable when police officers are effecting a stop or full arrest. *Id.* at 396, 109 S.Ct. 1865. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers[,] violates the Fourth Amendment." *Id.* (internal quotation and citation omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. 1865.

■ Again, considering the facts in a light most favorable to Johnson, the Court finds that a reasonable trier of fact could find that Weaver and Wolgemuth used excessive force in detaining him. Indeed, the reasonableness of physical detainment of any kind would be open to reasonable debate given the genuine issue of material fact regarding whether they had probable cause to arrest him in the first instance. If it is true, as the Court must assume for its current purpose, that Johnson did no more than tell the Defendants to leave his property and state that he was going to call the Germantown Police Department, a jury could find that it was unreasonable for Wolgemuth to grab him from behind in a bear hug, throw him against his pickup truck, spray him with mace, wrestle him to the ground, handcuff him and then refuse to apply reversal spray for a longer period than necessary. The Court does not conclude that these are the facts as they actually happened, but it must assume that they are true in ruling on the Defendants' Motion. If they are, then a trier of fact could find that the Defendants acted with excessive force.

Furthermore, the Court finds that if the facts as described herein are true, Johnson's right to be free from the excessive force used by Weaver and Wolgemuth was clearly established. The Defendants argue that they are entitled to qualified immunity under the standard clarified in *Saucier v. Katz,* 533 U.S. 194, 207–09, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The Court disagrees. The question in *Saucier* was whether a military officer had used excessive force when he administered a "gratuitously violent shove" upon the § 1983 plaintiff, who was, at the time, demonstrating at a speech given by then Vice President Gore. 533 U.S. at 197, 208, 121 S.Ct. 2151. "At about the time Vice President Gore began speaking, respondent removed [a] banner from his jacket, started to unfold it, and walked toward the fence and speakers' platform." *Id.* at 198, 121 S.Ct. 2151. It was alleged that the military officer then rushed the § 1983 plaintiff away from the area in which the Vice President was speaking, "half-walking, half-dragging him, with his feet 'barely touching the ground,'" and then violently shoved him into a transport van. *Id.* This Court has discussed *Saucier* in prior cases where use of excessive force has been alleged. *See Hummel,* 229 F.Supp.2d at 852–54; *Jones v. Marcum,* 197 F.Supp.2d 991, 1000–03 (S.D.Ohio 2002). In *Hummel,* the Court observed the following about the *Saucier* holding:

Conceding that reasonable minds might disagree on whether the force used was excessive under the circumstances, the Supreme Court nonetheless concluded that under that set of facts, the law was not settled as to whether it was excessive, and, therefore, that a reasonable officer, acting in the heat of the moment, might have found it reasonable

to act as he did. [533 U.S. at 207–08, 121 S.Ct. 2151.]

It is important to note that the Court considered the factual nuances in reaching its conclusion:

> [The officer] did not know the full extent of the threat [the detainee] posed or how many other persons there might be who, in concert with [him], posed a threat to the security of the Vice President. There were other potential protestors in the crowd, and at least one other individual was arrested and placed into the van with [him]. In carrying out the detention, as it has been assumed the officers had the right to do, [the officer] was required to recognize the necessity to protect the Vice President by securing [the detainee] and restoring order to the scene. It cannot be said there was a clearly established rule that would prohibit using the force [the officer] did to place [the detainee] into the van to accomplish these objectives.

[*Id.* at 208, 121 S.Ct. 2151.]

229 F.Supp.2d at 852 (alterations in text in original).

The Court, in *Hummel,* then distinguished the facts of its own case and pointed out why qualified immunity was not appropriate therein. In *Hummel,* when the facts were viewed in a light most favorable to the plaintiff, it was clear that his right to be free from the amount of force allegedly used by the defendant officers therein was clearly established. The defendant officers had arrived at the plaintiff's home to issue him several citations for suspected traffic violations which had occurred earlier in the day, and for no apparent reason (viewing the facts in a light most favorable to the plaintiff), the confrontation turned physical.

> It may very well be shown, when all of the facts are known, that the officers acted reasonably. Yet, for the moment, the Court has only Plaintiff's version of the facts to consider. By all accounts, the officers, Officer Allen in particular, were at Plaintiff's residence, on his property, to issue a citation or two, nothing more. According to Plaintiff, even this fact was not articulated to him. At some point, Plaintiff turned to retreat into his home and was apprehended by the three officers. This is troubling, considering Officer Allen did not need Plaintiff to be present in order to issue the citations. (*See* Allen Depo. at 29–32.) Furthermore, Plaintiff never posed a perceivable threat to Officer Allen or the other officers. (*See id.* at 40.) Given that Plaintiff did not pose a threat and was not under arrest, and that his presence was unnecessary for the issuance of the traffic and disorderly conduct citations, the obvious question which arises is why the officers laid a hand on him at all. Add to that the fact that, according to Plaintiff, not one but three officers physically apprehended him, and the even more troubling fact that they "threw" or "shoved" him against his car, and the protections of the qualified immunity doctrine quickly wilt. There is no question in the federal case law that such treatment is clearly unreasonable under the circumstances, and therefore excessive, and all of the officers should have been aware of Plaintiff's right to be safe from as much.

*Id.* at 854–55 (dismissing, for purposes of ruling on summary judgment, the unsupported arguments of the officers that they feared for their safety).

As do the Defendants in this case, the defendant officers in *Hummel* made no attempt to demonstrate how the facts of their confrontation with the § 1983 plaintiff were at all similar to the facts at issue in *Saucier;* they simply cited *Saucier* with the expectation that it commanded the application of the qualified immunity doc-

trine. The situation in the case at bar is identical: the Defendants cite plenty of black letter law, in particular that emanating from *Saucier*, but fail to demonstrate how that law applies in this context. As the Court stated in *Hummel:*

> Merely citing to *Saucier* is not itself a reason for the Court to recognize the applicability of the qualified immunity doctrine in a given case, and nothing in *Saucier* holds that police will always be immune from § 1983 liability. Had the Supreme Court intended that to be the case, it certainly would have said so. Thus, at some point, even the *Saucier* Court would have to recognize that police can be held liable under § 1983.

*Id.* at 854.

The facts of *Jones*, another decision rendered pursuant to defendant officers' motion for summary judgment, were similar to the facts of the case at bar. In that case, the Court phrased the relevant point as follows:

> Assuming the truth of Jones' deposition testimony, the question, for purposes of the qualified immunity analysis, is whether it would be reasonable for police officers to come upon a situation to which they've been called, find an individual who has already been subdued by unarmed security detail, and, without saying a single word to him or asking any questions, pin him against a car, then whirl him around, lift him up into a bear hug, throw him to the ground, and then sit, two at a time, on top of him, while a member of the security detail holds his neck in a choke hold. Add to this hypothetical, the facts that there is no emergency situation, the subdued individual is not armed and has put up no forceful resistance, and there is no reason to think that he poses a substantial risk to the officers or the public, or that any accomplice is likely to come upon the scene and attack the officers, and

the answer to the question is plain: such conduct would not be reasonable. More importantly, the law in this factual context is clearly established, and no reasonable officer could honestly doubt that such actions would violate the clearly established right of the individual to be free from such.

197 F.Supp.2d at 1002–03 (stressing that the defendant officers' own version of the facts could not be considered, given that the material facts were in dispute).

In both *Hummel* and *Jones*, the Court readily distinguished the facts of *Saucier*, and found that the better precedent to follow was that exemplified by the Sixth Circuit's holding in *Brandenburg v. Cureton*, 882 F.2d 211 (6th Cir.1989). In *Brandenburg*, the Sixth Circuit held that where a genuine issue of fact exists with respect to the conduct of the § 1983 defendant, such that it is impossible to determine without making findings of fact whether the defendant violated a clearly established right, qualified immunity cannot attach on summary judgment. 882 F.2d at 215–16. The Court explained the differences in *Hummel:*

> For example, assume that the plaintiff alleges that the defendant hit him over the head with his heavy-duty flashlight during an arrest for shoplifting, despite the fact that the plaintiff had put up no resistance. If the defendant denies the allegations and moves for summary judgment on the basis of qualified immunity, the motion would have to be overruled. Not only would there be a genuine issue of material fact on exactly what occurred, but the court would also have no problem finding ample authority holding, if the plaintiff's version of the facts proved to be true, that the defendant's conduct was unreasonable and he should have appreciated the fact that it was unreasonable at the time he was

hitting the plaintiff. In other words, on those facts, the law, as well as the plaintiff's rights thereunder, is clearly established. In such a case, *Brandenburg* controls, and *Saucier* is inapplicable.

By contrast, assume that in the example above, the detention of the plaintiff had taken place after a long foot chase, that the plaintiff was assumed by the defendant officer to be armed, and that the plaintiff does not dispute that the chase took place. Assume further that, as it turned out, the plaintiff was not armed, but that he does not dispute he had a lumpy metal object in his back pocket. If the plaintiff alleges that at the end of the chase, the defendant officer tackled him and shoved his head against the ground with excessive force, it might very well present a question of fact for the jury. That is, whether it was reasonable for the defendant to use as much force as the plaintiff alleged he used might be a jury question. However, addressing the question of qualified immunity, the court might determine, after a review of the relevant case law, that the circumstance in which the defendant officer found himself was a novel one which had never been addressed before. If that were the case, the court would likely be required to apply *Saucier*, given that, under that particular set of facts, the line between reasonable force and unreasonable force, and therefore lawful force and unlawful force, is blurred, and not clearly defined in the case law. Accordingly, summary judgment would be appropriate on the basis of qualified immunity.

*Id.* at 853–54.

As with the facts in *Hummel* and *Jones*, the disputed facts of this case require that qualified immunity be denied respecting the allegation of excessive force. Given these particular facts, viewed in a light most favorable to Johnson, the question is whether it was clearly established at the time of Johnson's arrest that a property owner who had committed no crime, as far as the arresting officers knew at the time, and was not under investigation for the commission of any crime, could be grabbed in a bear hug, thrown against his car, wrestled to the ground, sprayed with mace and handcuffed, and then left untreated for a longer period of time than necessary, merely for insisting that law enforcement officers, who were not in hot pursuit of a suspect, not acting under any other exigent circumstances and not acting pursuant to a warrant, remove themselves from his property and not attempt to re-enter his property without his permission. The answer to that question is "yes."

For the aforementioned reasons, the Defendants are not entitled to qualified immunity at this juncture. As to the existence of probable cause and use of excessive force during the morning confrontation, genuine issues of material fact exist, precluding not only a finding that the Defendants did not violate a constitutional right, but also a finding that they are entitled to qualified immunity at this juncture. *See Brandenburg*, 882 F.2d at 215–16.

### 2. The Lunchtime Confrontation

█ As noted, around 11:00 a.m., on October 16, 2000, Johnson returned home from the Montgomery County Jail to find the Defendants on his property. The question presented with respect to this confrontation, which the Court will refer to as the lunchtime confrontation, and the search which preceded Johnson's arrival back at his home, is whether the Defendants conducted an unwarranted search of Johnson's property, in violation of the Fourth Amendment's protection from unreasonable searches and seizures. Individuals have an expectation of privacy in their homes and its curtilage, and the

Fourth Amendment's guarantee of such privacy extends in the civil, as much as the criminal, context. *See Daughenbaugh v. City of Tiffin,* 150 F.3d 594, 598 (6th Cir. 1998). Unless law enforcement officers can point to an exception, it is required under the Fourth Amendment that they not search such areas without a warrant. Johnson's legal point seems to be that the harm of this search is that the Defendants gathered evidence which was later used to secure the search warrant, and that the warrant is therefore defective for that reason (similar to a "fruit of the poisonous tree" argument in a criminal suppression context). (Doc. # 32 at 14–16.)

Although the Court is skeptical of much of the Defendants' argument, based as it is on their right to enter onto private lands to enforce and maintain the "pervasive government regulation" of hunting (Doc. # 19 at 21 & 20–24 generally), it is satisfied that their actions pose no constitutional problem. As the Court has noted, the Defendants did not have the permission of the apparent land owner to enter onto his property, nor did they have the right to do so, contrary to their argument, under Ohio Rev.Code § 1531.13. As observed previously, the Defendants were investigating a completed crime, not one which they could have had "good cause" to believe was currently in progress. Even if they had a reasonable suspicion that contraband remains of an illegally shot deer might have existed on the property, they were required under § 1531.13 to obtain a search warrant under the circumstances.[12]

Although they may very well have been trespassing, under the law of Ohio, the Defendants did not engage in an unconstitutional search. They were met at the door of one of the residential houses by MacIntosh, and he accompanied them around the property, including the outbuildings. As an initial matter, anything they may have observed as they walked the driveway up through the farm property to the house would have been proper under the "open fields" doctrine, which holds that a property owner does not have an expectation of privacy outside of his house and its curtilage. *See Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924); *United States v. Oliver,* 686 F.2d 356 (6th Cir.1982). In any event, even if it can be argued that they entered into Johnson's curtilage before being greeted by MacIntosh, nothing in the facts adduced by the parties suggests that any fact later used to obtain the search warrant was found prior to their being greeted by MacIntosh.

Furthermore, after they were greeted by MacIntosh, the Defendants conducted their search pursuant to his apparent authority, if not actual authority, to allow them to do so. As the Sixth Circuit has stated in a recent case:

> A prohibition on entry of a person's home is inapplicable where voluntary consent has been given to the search by the owner of the home or property. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). If consent is given to search by an individual who has apparent authority, the Fourth Amendment's prohibition against a warrantless search does not apply. *Illinois v. Rodriguez,* 497 U.S. 177, 186, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). "When one person consents to a search of property owned by another, the consent is valid if 'the facts available

---

**12.** Their invocation of § 1533.14 to justify their entry is not well taken. That section is concerned with the requirement that every hunter on the lands of another must carry and exhibit his license. There is no suggestion that the Defendants were investigating an active hunt, and, in any event, this statute does not speak to the right of ODNR officers to enter private lands without the permission of the owner.

to the officer at the moment ... warrant a man of reasonable caution in the belief that the consenting party had authority over the premises.'" *United States v. Jenkins,* 92 F.3d 430, 436 (6th Cir.1996) (citing *Rodriguez,* 497 U.S. at 188, 110 S.Ct. 2793, 111 L.Ed.2d 148, and *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Thus, there is no violation of the Fourth Amendment if, under the totality of the circumstances, the officer performing the search has relied in good faith on a person's apparent authority. *Rodriguez,* 497 U.S. at 188–89, 110 S.Ct. 2793, 111 L.Ed.2d 148.

*United States v. Campbell,* 317 F.3d 597, 608 (6th Cir.2003).

Johnson argues that MacIntosh did not have authority of any type to consent to the Defendants' search of his property and outbuildings (Doc. # 32 at 15), but he does not elaborate on this proposition or cite any legal authority for support. The argument is not well taken. The deer identification tag listed MacIntosh as its owner and 10240 SR 123 as his address, a residential house located on Johnson's property. Furthermore, Johnson has not denied the representation that MacIntosh was his stepson. Given these facts, it can hardly be argued that the Defendants and Investigator Tunnell did not act reasonably and in good faith in assuming that MacIntosh had the authority to allow them to look around the farm property and outbuildings.

Because there is no genuine issue of material fact regarding the constitutionality of the Defendants' search of Johnson's property leading to the lunchtime confrontation, there is no need to even consider the qualified immunity analysis, though it goes without saying that it would be impossible, given the above discussion, to show that the Defendants violated a clearly established right of Johnson in this respect.

### 3. *The Evening Confrontation*

The question presented with regard to the evening confrontation, when the Defendants and other law enforcement officers executed a search of Johnson's house, also concerns the Fourth Amendment, and asks whether the warrant obtained by Weaver and Wolgemuth to search Johnson's house was defective, such that they violated his constitutional right to be free from unreasonable searches and seizures. The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." "To determine whether such a description is constitutionally valid, a judge must ask whether the place to be searched is described with sufficient particularity to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premise might be mistakenly searched." *United States v. Pelayo–Landero,* 285 F.3d 491, 495–96 (6th Cir.2002) (citations and internal quotations omitted).

█ In this instance, in seeking a search warrant, Weaver and Wolgemuth were acting properly, pursuant to § 1531.13. A single form document incorporated both the affidavit used to obtain the warrant and the warrant itself. (Copies of same are attached to Weaver's affidavit and the Defendants' Reply brief.) The affidavit portion of the form described the structures to be searched as 10240 SR 123 and all outbuildings and vehicles associated with that property. It also specifically stated (on the back side, but specifically referencing the "property to be seized" paragraph on the front) that the

items to be seized were all 12–gauge shotguns and wild animals, or parts of a wild animal, not legally possessed. This is descriptive enough to satisfy the strictures of the Fourth Amendment. Furthermore, the affidavit demonstrates adequate facts to give rise to a probable cause finding. Most notably, it describes the written statement given by MacIntosh supporting the allegation that Johnson had shot the deer in question with a 12–gauge shotgun which he kept in his house, and that he had hung the deer (presumably its trophy head) in an outbuilding.

An additional concern, however, is whether the Defendants' search was unconstitutional, given that it appears they searched 10232 SR 123, even though their warrant only granted them the authority to search 10240 SR 123, a different residential house on the greater farm property. Having reviewed the case law, the Court is satisfied that there was no constitutional defect to the search. Assuming that the Defendants did in fact enter and search Johnson's house at 10232 SR 123, Sixth Circuit cases involving similar facts demonstrate why their actions were legal under the facts of this case.

In *United States v. Durk*, 149 F.3d 464, 465 (6th Cir.1998), the Sixth Circuit evaluated the constitutionality of a search warrant which had described the house to be searched as being located at "4612 Fulton ... on the north side of Fulton ... approximately 3 houses to the east of Grandview." The warrant also described the house as a "red brick ranch home" with a "metal storage shed behind the home ... which is secured by a plastic tie." *Id.* In fact, the residence searched was located at 4216 Fulton, and was located three houses to the *west* of Grandview. *Id.* The district court suppressed the evidence, agreeing with the defendant that no reasonable police officer, acting in good faith, *see United States v. Leon*, 468 U.S. 897, 104 S.Ct.

3405, 82 L.Ed.2d 677 (1984), could have relied upon the warrant to search the residence at 4216 Fulton. The Sixth Circuit reversed.

The test for determining whether a search warrant describes the premises to be searched with sufficient particularity is not whether the description is technically accurate in every detail, but rather whether the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premises might be mistakenly searched.

149 F.3d at 465. The Court held that the physical description of the house, the description of the metal shed in the backyard, the affidavit's accurate reference to the defendant as the tenant of the house to be searched, the fact that the executing officer was also the affiant and was familiar with the house to be searched, and the fact that another officer remained at the house to be searched while the affiant officer obtained the search warrant, all served to overcome the inaccurately described address and the location of the house in relation to Grandview. *Id.* at 466.

A more recent case relied upon and reaffirmed the holding in *Durk. See Pelayo–Landero, supra.* In *Pelayo–Landero,* the house searched was a mobile home inside a mobile harm park. 285 F.3d at 493–94. The warrant described the address of the mobile home park, to be distinguished from the mobile home itself, as "1418 Mae Collins Road." *Id.* at 493. It then described the location of the mobile home to be searched by describing the directions to that home from a known, outside geographical coordinate. *Id.* It also provided a physical description of the outside of the home. *Id.* In moving to suppress in the district court, the defendant had argued that the address of the

mobile home park was incorrect, and that the mobile home searched was not even on Mae Collins Road. The district court had overruled the motion, finding that the directions to the mobile home and the physical description provided were ample, particularly given the fact that the executing officers had previously monitored the mobile home to be searched, assuring that the warrant would not be executed upon the wrong home. *Id.* at 495. The Sixth Circuit affirmed the district court's decision, relying on its holding in *Durk,* and emphasizing once again that where a description of the house to be searched is given, specific reference is made to the house's occupant, and the warrant is executed by an officer already familiar with the location, due to prior surveillance, inaccuracies in the description of the street address will not render a warrant unconstitutional. *Id.* at 497.

*Durk* and *Pelayo–Landero* control in this case. *See also United States v. Lemmons,* 527 F.2d 662, 665–66 (6th Cir.1975) (holding that there was no constitutional violation where a warrant was issued for a shop at "9300 Woodward," but where, once inside, the executing officers also searched "9304 Woodward," which was connected by an internal archway and used as an extra space by the shopkeeper), *cert. denied,* 429 U.S. 817, 97 S.Ct. 60, 50 L.Ed.2d 77 (1976). As the *Durk* Court remarked, "[t]he evil that the framers of the Constitution were trying to eradicate with the particularity requirement was the so-called general warrant that allowed officers to search at random." Even if 10240 SR 123, which the affidavit and warrant at issue in this case listed as the address of the house to be searched, is not the address of the house the Defendants actually searched, the error is harmless. The affidavit described a two-story brown brick house with an attached garage, a brown roof, and a black cattle fence on the east, south and west sides of the property, and Johnson

does not dispute this general description of his house, i.e., the house at SR 10232, the property actually searched. It also referenced the fact that Johnson was one of the suspects of the alleged illegal deer shooting and that he kept the suspect weapon, a 12 gauge shotgun, in his house, and that it was this shotgun that was the subject of the planned search and seizure. More importantly, Weaver and Wolgemuth, two of the executing officers, had been to the property earlier in the day and had been informed by MacIntosh of the whereabouts of the suspect shotgun. Given these undisputed facts, the Court cannot agree with Johnson that his Fourth Amendment rights were violated.

Again, because there is no genuine issue of material fact regarding the constitutionality of the Defendants' search of Johnson's house, there is no need to consider the qualified immunity analysis, though it can be repeated that it would be impossible to find a violation of a clearly established right of Johnson, given the absence of a constitutional violation in the first instance.

### III. *Conclusion*

For the reasons and citations of authority stated above, the Court concludes as follows:

(1) the Defendants' Motions for Judgment on the Pleadings (Doc. # s 9 & 27), construed herein as motions to dismiss for lack of subject matter jurisdiction, under Rule 12(b)(1), are SUSTAINED. The ODNR and the individual Defendants, to the extent they have been sued in their official capacities, cannot be sued in this Court. Furthermore, the individual Defendants cannot be sued in this Court in their individual capacities under the common law of Ohio, until their amenability to suit has been determined by the Ohio Court of Claims. This particular ruling does not

affect Johnson's ability to sue Weaver and Wolgemuth in their individual capacities under 42 U.S.C. § 1983.

(2) Johnson's Motion to Strike the Affidavit of Samuel D. Faulkner (Doc. # 37) is OVERRULED, but only because such a procedure is not the proper means of disposing of the issue he raises with respect to that affidavit. The Court agrees that the affidavit cannot be considered in ruling on the Defendants' Motion for Summary Judgment, and, accordingly, it has been discounted in its entirety.

(3) The Defendants' Motions for Summary Judgment on the Basis of Qualified Immunity (Doc. # s 19 & 28) are SUSTAINED IN PART and OVERRULED IN PART. They are sustained with respect to Johnson's allegations that the Defendants violated his Fourth Amendment rights when they entered onto his property pursuant to what the Court has described as the lunchtime confrontation, and when they searched his house pursuant to what the Court has described as the evening confrontation. They are overruled with respect to Johnson's allegations that they arrested him without probable cause, and used excessive force in doing so, when they confronted him in his driveway pursuant to what the Court has described as the morning confrontation.

Accordingly, this case remains viable insofar as Johnson has sued Weaver and Wolgemuth (and other as-of-yet unnamed Defendants), in his Fourth Cause of Action, for violations of his right to be free from arrest without probable cause and excessive force, actionable under 42 U.S.C. § 1983, during the morning confrontation.

Counsel of record will take note that a telephone conference call will be held, beginning at 8:40 a.m. on Wednesday, April 2, 2003, for the purpose of rescheduling a trial date and other dates leading to the resolution of this litigation.